# HEYWORTH et al. v. MILLER GRAIN AND ELE-VATOR COMPANY, Appellant.

## Division One, April 1, 1903.

1. **Interoceanic Trade:** DEFINITION OF "CARGO" AND "PARCEL." A "parcel" sale is of a definite quantity of grain placed in an ocean vessel with any other freight, to be delivered at a definite port to which the vessel is bound by its charter. A "cargo" sale means that the whole purchase must go in one vessel, which carries no other freight, in order that the whole purchase may be handled without any complications by the purchaser. This vessel is consigned to some port, "for orders", and on its arrival at that port it finds orders from the purchaser to proceed to some named port and unload.

2. ———: CARGO SHIPMENT. It is held in this case that a contract for 12,000 quarters of corn set out in the opinion, which contained the words "Cork for orders" was a "cargo" sale, and the defendant having shipped an amount greater by ten per cent than that called for in the contract, the purchaser was authorized by the custom of the trade in refusing to accept the shipment.

3. **Depositions in Another Suit.** Depositions taken in another suit between the same parties may be read in the suit on trial if they concern the same subject-matter. And the burden is on the party objecting to show that the court committed error in permitting them to be read, and if on appeal the pleadings in the other suit are not preserved in the record the appellate court will not assume to say that the issues were not the same in the two cases or that the depositions did not concern the same subject-matter.

4. **Interoceanic Trade:** SPECIFIC CONTRACT: TESTIMONY AS TO MEANING OF WORDS. Where the terms used in cablegrams and letters that went to make up an interoceanic contract for the purchase of grain, were technical, and were applicable, in the sense in which they were used, to the trade in which the parties were engaged, testimony as to the proper meaning of the words employed is admissible.

5. ———: CUSTOM: CHARGEABLE WITH KNOWLEDGE: VARIANCE IN BILL OF LADING: INTERNATIONAL TRADE. One who engages in a certain trade is chargeable with knowledge of the usage of that trade. A merchant in St. Louis who holds himself out to the public as an export vender of grain, is chargeable with a custom as general and extensive as the trade itself, that a shipment of "cargo" grain in the bill of lading can not vary more than ten per cent, either way, from

the amount fixed in the contract of purchase, and that if it so varies the purchaser has the right to refuse to accept such a cargo as a proper tender under the contract. He is also chargeable with knowledge of the fact that an oceanic bill of lading must be accurate and technically regular, and that an inland American railroad bill of lading seriously interferes with the market value in Liverpool of the cargo's value.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris*, Judge.

Affirmed.

*Rassieur & Rassieur* for appellant.

(1) If the contract provided simply for a sale of 12,000 quarters, then the "Gloucester" shipment was in compliance with the contract in all respects. (2) If the contract called for a cargo shipment, then the plaintiffs could reject the shipment, because it exceeded the quantity contracted for; but their unqualified acceptance amounted to a waiver of any breach of conditions—unless it can be said that the manner of shipment agreed upon constitutes a warranty. Stevens v. Mackay, 40 Mo. 224; Graff v. Foster, 67 Mo. 520. (3) In case of breach of warranty as to the manner of shipment, the purchaser, if he does not wish to reject the goods, can only recover the damages sustained by reason of the difference in the manner of shipment. (4) There was no evidence to the effect that corn in a parcel shipment was worth less than corn in a cargo shipment. From the very nature of that staple there could be no such difference. The depreciation in value upon the day of the arrival of the "Gloucester" was due to the fluctuation and depreciation in value of all corn, on that day, no matter how shipped. (5) The depositions of plaintiffs' witnesses taken in a former suit, involving different issues, should have been excluded. Borders v. Barber, 81 Mo. 644. (6) Expert testimony as to the

proper construction of the contract, viz., as to whether it implied a cargo shipment or a parcel shipment, was incompetent; that was the province of the court, not of the witnesses. Usage can not control a contract where its terms are clear of doubt. Kimball v. Brawner, 47 Mo. 398. (7) Evidence as to the usage of Liverpool merchants, and of the rules of the Liverpool Corn Exchange was incompetent: (a) Because the law determines the rights of the parties under the contract, and these rights can not be altered by usage. S. W. F. & C. P. Co. v. Stanard, 44 Mo. 83; Ober v. Carson, 62 Mo. 214. (b) Because it was not shown that defendant had any knowledge of such foreign usage. Coquard v. Bank, 12 Mo. App. 266; S. W. F. & C. P. Co. v. Stanard, 44 Mo. 71. (c) Since Liverpool was not the place of delivery agreed upon, its custom or usage could not enter into the contract.

*Lee W. Grant* for respondents.

(1) It is too late for defendant to claim that the introduction of expert evidence as to whether the terms employed meant a cargo or parcel shipment was error, because defendant itself introduced the evidence of its secretary, Miller, and of Culpepper to explain the terms used in supplemental abstract. Having tried this issue, it waived any error if there was any. However, there was no error, because the terms "Cork for orders" were technical, and would not of themselves, to the uninitiated, indicate either parcel or cargo shipment. When a word is used in a technical sense, evidence of usage may be introduced to explain it. Kimball v. Brawner, 47 Mo. 400. So, also, evidence of usage may be introduced to interpret the meaning of mercantile contracts. Evans v. Western Brass Mfg. Co., 118 Mo. 548; Storck v. Mesker, 55 Mo. App. 26. (2) No exception was saved by defendant to the overruling of the motion to suppress,

and he has not set out in his bill of exceptions. the pleading in the other case. As two trial judges and the learned referee both ruled that the depositions were competent, some presumption as to the correctness of the ruling of the trial ought to prevail. The appellate court assumes everything in favor of the rulings of the trial court. Porth v. Gilbert, 87 Mo. 125; State v. Harkins, 100 Mo. 671. Objection must be made before trial by notice to suppress. State ex rel. v. Dunn, 60 Mo. 70. He who complains of error must show it. Flynn v. City of Neosho, 114 Mo. 572; Guinn v. Boas, 31 Mo. App. 131. If any of the counts in two cases were substantially the same, the depositions would have been competent. Or if the issues were substantially the same, or if the subject of the action was the same, the depositions would have been competent. Lohman v. Stocke, 94 Mo. 672; Allen v. Chouteau, 102 Mo. 318; Bliss, Pleading (3 Ed.), secs. 126 and 373. (3) In an ordinary action upon a warranty, where the purchase price has been paid, the measure of damages is the difference between the price paid and the market value of the article at the time and place of delivery. Walls v. Gates, 4 Mo. App. 1; Messmore v. N. Y. Shot & Lead Co., 40 N. Y. 427; Miles v. Withers, 76 Mo. App. 87. (4) Or where the value of the article, if it had corresponded to the warranty, is greater than the purchase price, the rule is stated that the measure of damages is the difference between the actual value of the article received and what its value would have been if it had corresponded to the warranty. The referee seems to have adopted the first rule, as above stated. Probably because the article bought in this case had no market value, although as delivered it had a market value. The more correct rule as applicable to this case, which was the one contended for by us, is, that the measure of damages was the difference between the price at which plaintiffs had resold their contract with defendant and

the market value of the grain delivered by defendant at the time when the ocean bills of lading arrived in Liverpool. As, however, the amount of the judgment in such case would have been larger than the amount actually rendered, appellant has no right to complain. Hadley v. Baxendale, 9 Exch. 341; Messmore v. N. Y. Shot & Lead Co., supra; 2 Sutherland, Damages, secs. 1477-1504.

VALLIANT, J.—Plaintiffs are partners composing a firm of merchants in Liverpool, engaged in the grain trade; defendant is a corporation in St. Louis engaged in like business. In 1892, the two concerns had transactions together involving shipments of corn by defendant at St. Louis to plaintiffs in Liverpool. Out of these transactions, disagreements have arisen between the parties which have led to this suit.

The plaintiffs' petition is in three counts, each relating to a separate transaction. The cause was by consent referred to Fred A. Wislizenus, Esquire, to try all the issues. The findings of the referee were for the plaintiffs on the three counts. Exceptions to his report were overruled, and judgment for plaintiffs was rendered in accordance with his findings, for the sum of $5,947.17, from which judgment the defendant has appealed.

No assignment of error is made to the rulings and judgment of the trial court, in so far as they relate to the first and third counts of the plaintiffs' petition, but the rulings and judgment as they relate to the cause of action stated in the second count, are complained of. The essential difference between the plaintiffs and the defendant lies in the construction that each party places on the contract under which the grain, mentioned in the second count, was shipped. The plaintiffs maintain that it was a contract for a cargo shipment, while defendant holds that it was for a parcel shipment. The decision of that question is

the decision of the case. The terms "cargo" and "parcel" as relating to the trade in which these parties were engaged, are technical and expert testimony from both sides was heard by the referee to explain their meanings. We think the testimony sustains the referee in his understanding of the meaning of these terms, and as his definition is so clearly expressed in his report, we quote it:

"The most important matter in this interoceanic trade bearing on this case is the distinction between 'parcels' and 'cargoes' with the special law as to 'cargoes' established by the customs. A 'parcel' sale is of a definite quantity of grain placed in an ocean vessel with any other freight, to be delivered at a definite port to which the vessel is bound by its charter. It is the ordinary sale transaction; the special customs of which trade between Liverpool and America, do not concern us in this matter. The essential feature of a 'cargo' transaction is that the whole purchase must go in one vessel, which carries no other freight, in order that the whole purchase may be handled without any complications by the purchaser. This vessel is consigned to some convenient port, which need not be a grain market, as for instance 'Cork, for orders.' On arrival at this port, the vessel finds orders from the purchaser to proceed to some defined port and unload. The limits as to selection of such other port are fixed in the contract; of course the charter party of the freighter must conform. The agreement usually covers ports in the United Kingdom, as also a portion of the European continental seaboard. This flexibility as to cargoes, this opportunity of sending them to the best market on their arrival with information beyond possibility of knowledge when purchase was made and even when the grain left America, renders cargoes particularly desirable at Liverpool. The cargo contracts command a premium over the market price of 'parcel' grain,

and this, too, in spite of the fact that freight to the point of ultimate delivery is almost sure to be somewhat higher than in case of direct shipment to that port.

"A contract for a cargo calls for a definite amount of grain, as, say, 12,000 quarters. The custom of the trade has fixed the limits within which the amount in the bill of lading may vary from the amount fixed by the contract at ten per cent of the contract amount. For instance, on a cargo contract for 12,000 quarters, any amount between 10,800 quarters and 13,200 quarters is a proper tender. If, however, the variance either way exceeds the ten per cent, though but a trifle, the purchaser has the right to refuse to accept such a cargo as a proper tender under the contract.

"Attention must be called to the superior advantages of ocean bills of lading over inland bills of lading in this grain traffic across the Atlantic. Even as regards parcels, ocean bills of lading are much more satisfactory to the Liverpool merchant than our through inland bills issued by some railroad. Contracts pass from hand to hand in the Liverpool market. Precision is essential. Anything outside the routine form is destructive of negotiability. Technical irregularity as to a note, or cloud, however frivolous, on the title of realty collateral to the note, makes such papers troublesome to handle here. It is easy for us, who study this question from the records before us, to appreciate the fact that in a world market, such as Liverpool, a railroad bill of lading from St. Louis calls up doubts and presents possibilities which seriously interfere with its market value. It seems, however, that parcels are shipped at times from St. Louis to Liverpool; but the evidence makes it clear that it is impracticable, if not impossible, to ship a cargo on an inland bill of lading."

The testimony shows that late in December, 1891,

Vol 174 mo—12.

or early in January, 1892, a Mr. Gilchrist, representing the plaintiffs, was in St. Louis and held several conversations with defendant in the person of Mr. Miller, looking to the establishment of business relations between the parties. In these conversations, according to the testimony of defendant, the subject of ocean and inland bills of lading was discussed, Mr. Gilchrist at first insisting on ocean, but finally agreeing to inland bills of lading.

On January 27, 1892, plaintiffs mailed the followlowing letter to defendant, which it received on February 9th.

"Liverpool, January 27, 1892.
"Messrs. Miller Grain & Elevator Co., St. Louis.

"Dear Sirs: Our representative, Mr. Arch Gilchrist, advises us that he has had the pleasure of meeting your president, and had had some conversation with reference to export business. If, as we gather from the tenor of his advices, you are fully equipped to do this business, we have no doubt but that we could work with advantage. The drawback to grain business from interior points is the difficulty of sellers giving ocean bills of lading, which are a necessity for satisfactory business. If you can arrange to give us ocean bills of lading for anything you sell us, the business can be done, but if not, it would appear to be a necessity that the business should go through houses at the seaboard. The delays and shortages, etc., which at present accompany through bills of lading business are matters over which we have no control, and they are consequently risks and liabilities, which we hardly feel ourselves called upon to accept. At present we do business with many of the seaboard houses to whom you are sellers, and there is really no necessity for these intermediates if the business is properly looked after. We should imagine that you have competent agencies, etc., to properly care for any of your shipments.

"We await your further advices and shall be pleased to have your cable code.

"As regards parcel business, we should prefer a commission of one per cent to be included, and as regards cargo business a commission of one and one-half per cent as in the case of the latter we have to return one-half per cent to the buyers."

On February 11th, defendant received the following cablegram from plaintiffs: "We are offered subject to your immediate reply by cable February and March shipments 20s. 6d. per quar. Cork orders. We charge you one per cent commission—12,000 quarters. American Rye terms." The last words "American Rye terms" have a technical meaning understood by the parties, relating to a point not in dispute and may be dropped out of consideration. On February 12th, defendant answered by cable: "We accept your offer 20—6 12,000 corn." On the same day, plaintiffs cable: "We confirm same; 12,000 cargo 20—6; orders February and March shipments. American Rye terms; we charge one per cent commission. Say port anything less direct. Please telegraph us early." "Say port anything less direct" was shown by the evidence to mean an inquiry whether there might be a reduction in price if the corn should be ordered directly to some port instead of going to Cork for orders. On February 13th, defendant cabled plaintiffs "Might reduce direct port 3d." Plaintiffs on the same day replied by cable "Make contract 20—3 direct U. K. 20—6 orders or continue direct." On February 15th, defendant cabled: "Contracted Cork orders. Please telegraph early port wanted. Will change if possible." On same day, plaintiffs cabled: "We confirm your arrangement. Give date of sailing and name of vessel carrying." Nothing further passed in reference to a change to a direct port and the contract stands as originally specified, "Cork for orders." In addition

to those cablegrams the defendant wrote to plaintiffs, received February 11th, as follows: "As result of to-day's cables, we beg to confirm sale to you 12,000 quarters No. 2 corn ten per cent more or less at 20—6, Cork for orders, your commission one per cent. Rye terms, February or March shipment. This corn is now at Norfolk and we will arrange for vessel by to-morrow or next day and expect to ship it all within a week." Plaintiffs wrote by mail to defendant, under date February 13th, in which was the following:

"With regard to the cargo, we must point out that you have been in your messages very sparing of information as to the terms on which you sell; you have not even up to the present given us the port from which you intend to ship although we have asked for it two or three times. It is most important in the case of cargoes that we should have full particulars, as we can not enter into contracts for these larger risks with buyers here leaving anything indefinite. These cargoes are turned over ten or twenty times and the result generally is that at least one buyer makes a stiff loss, and if there is any discrepancy in the terms of the contract or charter party or any other particular he takes the opportunity to make trouble, and if possible to get out of his bargain and loss."

The evidence on the part of the plaintiffs tended to show that one of the characteristics of a cargo transaction in the export grain trade from America to England was that a variation in quantity of grain shipped of ten per cent more or less, but strictly neither more nor less, was allowed the seller, that is, in a sale of a cargo of 12,000 quarters, the seller might tender and the buyer was bound to accept a cargo varying from 10,800 quarters to 13,200 quarters, and that such a tender was a fulfillment of the seller's contract. The allowing of this variance was accounted for as a necessity arising out of the fact that the seller had to take the weights as they came to him from the

west, which were liable to vary from the correct weights when tested in the elevators. Defendant conceded that this ten per cent variation was an allowable feature of its transactions with the plaintiffs, but its testimony was that that was one of the terms agreed on with Mr. Gilchrist and applied as well to parcel as to cargo sales.

As in fulfillment of the contract evidenced by the foregoing cablegrams and letters, defendant, on February 16th, shipped to plaintiffs 15,996 quarters of corn under a railroad through bill of lading from St. Louis to Liverpool, and drew on plaintiffs for 10,593 pounds, attaching draft to the bill of lading. The Bank of Commerce in St. Louis discounted the draft for defendant and the same was presented to plaintiffs in Liverpool March 1st, with the railroad bill of lading attached. Whereupon, plaintiffs cabled defendant: "Shipment 16 ulto. will not fill 12,000 contract. Can not accept draft. Documents untenderable to buyer. Telegraph quick. Waiting reply. Have you steamer's bill of lading. What is steamer's name." To which defendant replied by cable same day: "Accept draft as made. Sell surplus our account. Railroad reports expect commence loading the seventh. They will forward you separate ocean bill of lading 12,000." On receipt of this plaintiffs accepted the draft.

Plaintiffs answered same day: "Must on no account exceed 13,200 first cargo. Ship surplus second or ship Liverpool by steam. Pending receipt steamer's bill of lading we will protect your draft. Confirm." On March 2, defendant cabled: "Confirm. Send ocean bill of lading for 13,200." On March 3, defendant cabled: "Telegraph us fully at our expense shipping instructions. Will have ocean bill of lading and insurance made accordingly." After this correspondence, defendant forwarded in the steamer City of Gloucester 13,725 quarters under two

bills of lading, one for 13,200 quarters, the other for 525 quarters; the balance of the 15,996 quarters was forwarded in another vessel.  These ocean bills of lading were obtained from the steamer by the railroad company who forwarded them to a bank in Liverpool to be delivered to plaintiffs, in exchange for the rail-road bill of lading, which was done.  On March 18th, defendant cabled plaintiffs how the shipments were made and plaintiffs replied: "You have not carried out shipping instructions.  Quantity shipped is not in accordance with contract."  On 21st of March, defendant cabled:  "Sell 400 quarters excess Gloucester our account."  To which plaintiffs replied:  "We can not arrange as suggested."

When the corn arrived in Liverpool the market had declined and the plaintiffs, treating it as a consignment, sold it at the then prevailing rate, 19s. 66d. The referee, sustaining the plaintiffs in that theory, stated the account between the parties relating to the transaction by charging the defendant with the amount of the draft that the plaintiffs paid, and a few small items not disputed, and crediting it with the proceeds on the sales of the corn, which resulted in a balance in plaintiff's favor of £805 5s. 5d.; concerning these figures, defendant, in its briefs, says:  "If the theory is correct, then the amount may be taken as correct." If, therefore, the referee was correct in his interpretation of the contract, he was correct in the account stated by him.  The plaintiffs' testimony tended to show that on February 26th they sold this contract as a cargo contract at 21 shillings, but when they received the cablegram of March 18th, informing them as to how the shipment was made, seeing that they could not deliver it as sold, bought it back at the rate then prevailing, 21 shillings 7½ pence.  In the profit they would have made on the sale and the loss they sustained in buying back, plaintiffs' figures show that they suffered to the amount of £675, in addition to the

£805 5s. 5d. the referee found to be due them on the transaction, but the referee found against them on that contention.

· There was in the defendant's answer, a counterclaim founded on the theory that the transaction in dispute was a parcel sale and the plaintiffs were chargeable in the account with 13,200 quarters at 20s. 6d. On that issue the referee found for the plaintiffs.

A large part of the plaintiffs' testimony was in the form of depositions taken in another suit, between the same parties, and when offered, defendant objected "on the ground that they were incompetent and improper as evidence in this case;" the objection was overruled and exception taken. That ruling is now assigned as error, the specification being that the depositions were incompetent because taken in a former suit, involving different issues, citing in support of the contention Borders v. Barber, 81 Mo. 636, where it is said: "Whilst it can not be maintained, in admitting depositions taken to be used in another trial, that complete mutuality is required, as in the case of judgments, yet the general rule so far applies that the issues in both cases must be the same." The pleadings in the case in which the depositions were taken are not in this record and therefore we are not informed as to what issues were contained, but the trial court was in a better position than this court to pass on that question, and we must presume it did so in the light of the pleadings in that case. At all events, the burden is on the appellant to show that the court committed the error complained of. Depositions taken in another suit between the same parties, may be read in this suit if they concern the same subject-matter. [Allen v. Chouteau, 102 Mo. 209.] Judging from the depositions themselves, they relate to exactly the same subject that is here in dispute. We see no error in the court's ruling on that point.

Objection is urged to the evidence relating to the proper meaning of the words employed in the correspondence, on the ground that it is the province of the court and not of the witnesses to construe the contract. On this point we are referred to Kimball v. Brawner, 47 Mo. 398. In that case the court said: "No usage, however general and well understood, can be permitted to control the terms of a special contract, where the subject-matter of the contract and its terms are, as in this case, clear of all doubt and obscurity." But in the same connection, the court adds: "Where the subject-matter of a contract is in doubt, extrinsic evidence may doubtless be employed to establish facts and circumstances showing the true subject of the contract. So, when a new and unusual word is used, or when a word is used in a technical or peculiar sense, as applicable to any trade or calling, or to any particular class of people, evidence of usage may be employed to explain and illustrate the unusual word or technical term."

The law as there expressed sustains the ruling of the referee in the admitting of this expert evidence. The terms used in those cablegrams were exceedingly technical and were applicable, in the sense in which they were used, to the trade in which these parties were engaged. Without that testimony, no one not schooled in the technicalities of the trade would understand the meaning of the words the parties employed in dealing with each other.

It is also contended that the expert testimony was incompetent as tending by usage to alter the rights of the parties under the contract. In Southwestern. F. & C. Press Co. v. Stanard, 44 Mo. 71, it was said: "A custom to be good must be general, uniform, certain, and notorious; and, to be binding on parties to a transaction, must be distinctly known to them, or so universal and general in its character that knowledge may well be presumed. Where a contract is

made as to a matter about which there is a custom well established, such custom is to be understood as forming a part of the contract, and may always be referred to for the purpose of showing the intention of the parties in all of those particulars which are not expressed in the contract. But evidence of custom, however, is never admissible to oppose or alter a general principle or rule, so as to make the rights and liabilities of parties other than they are at law.'' The same principle was declared in Ober v. Carson's Exr., 62 Mo. 209. The testimony for the plaintiffs showed that the usages in the trade referred to were as extensive and general as the trade itself; that they were understood by and governed the conduct of the parties engaged in the business, not only at one end of the line, but at the other also—not in Liverpool alone, but in St. Louis as well.

Indeed, from the very nature of the business, it could not be intelligently conducted if the party on one side acted on one theory and the party on the other side on another. It was not a custom of the Liverpool trade, governing a business with both ends in Liverpool but a custom of merchants in Liverpool and St. Louis trading across the ocean with each other, and it was shown to have been known as well in St. Louis among men engaged in exporting grain to Liverpool as it was in Liverpool among men engaged in receiving grain from St. Louis.

Appellant says in its brief that testimony as to the usage should not have been received ''because it was not shown that defendant had any knowledge of such foreign usage.''

If it was a usage of the trade, the defendant was bound to know it when it entered the trade. A merchant is chargeable with knowledge of the usages of a business in which he holds himself out to the public as competent to be dealt with. Besides, the defendant, in the person of Mr. Miller, testified that it did know

the usages of the trade: ''I have been in the grain export business most everywhere, exporting and shipping in this country and buying grain. In that way, I have become familiar with the terms ordinarily used in the export business and the methods and customs which pertain to that business.''

Then the witness proceeded to testify as an expert, defining the technical terms in question and explaining the customs of the export trade. In doing so, his testimony to some extent conflicted with that of the plaintiffs' expert witnesses, with that even of defendant's expert witness, Culpepper, who, when the whole case was given to him in a hypothetical question, answered that the contract called for a cargo.

We do not deem it necessary to discuss the evidence in detail, but it is sufficient to say that by a fair preponderance it justifies the referee in all his findings.

We see no error in the record, and the judgment is affirmed. All concur.