THOMAS J. JENKINS, Respondent, v. SPRING-
FIELD REDUCTION AND CHEMICAL CO.,
AND JOHN C. DYSART, Appellants.

Springfield Court of Appeals, March 3, 1913.

1. **CONVERSION: Justification Under Contract of Sale: Con-
struction of Terms: "Tankage."** In a suit for the conversion
of a quantity of fertilizer, defendants claimed under
a contract which passed ownership to defendants of a fertilizer
plant, together with the "tankage" in the plant. And the evi-
dence showed that this fertilizer was "tankage" mixed with a
considerable quantity of other ingredients. *Held*, that under the
dictionary definition of "tankage" as "waste matter from tanks,
especially the dried, nitrogenous residue from tanks in which
fat has been rendered, used as fertilizer," the *fertilizer* in ques-
tion did not pass to the defendant under the term "tankage,"
by virtue of the contract.

2. **CONTRACTS IN WRITING: Construction of: Parol Evidence
to Explain.** It is neither necessary nor proper to introduce
extrinsic evidence to show the meaning of a certain word in a
written contract, if that word has an ordinary and common
meaning.

3. **APPEAL: Inconsistent Positions.** Parties litigant are not
allowed to assume inconsistent positions in court. They are
bound on appeal by the position which they successfully assumed
in the trial court.

4. **————: Position in Trial Court and on Appeal Not to be
Contradictory.** Defendants having successfully contended in
the trial court that extrinsic evidence could not be introduced
to show that any particular product was or was not, by the
understanding of the parties at the time the contract was made,
included in the word *"tankage,"* or excluded therefrom, they
will not be allowed on appeal to change that position and thereby
put the trial court in error for having adopted this theory, either
in the admission of certain evidence or in an instruction which
limited the evidence in accordance with that theory.

5. **CONTRACTS IN WRITING: Parol Evidence Cannot Vary.**
Under a written contract which provided that all *"tankage"*
should pass to the purchaser, it is not permissible to show, by
outside evidence, that it was understood by the parties to the
contract, that a different product, to-wit, "all the *fertilizer* on
hand, except that in sacks," was included; as the effect of such
evidence would be to change, add to and vary the written con-
tract.

Appeal from Greene County Circuit Court.—*Hon. Guy D. Kirby,* Judge.

AFFIRMED.

*G. A. Watson* and *Patterson & Patterson* for appellants.

(1) •The rule laid down in instruction 1 violates three cardinal rules of construction.   a.   In construing a contract the intention of the parties, if the same can be ascertained, must govern.   Maginn v. Lancaster, 100 Mo. App. 116; Wall v. Casualty Co., 111 Mo. App. 504; Imboden v. Trust Co., 111 Mo. App. 220; Wilson v. Wilson, 115 Mo. App. 641; Comstock v. Flower, 100 Mo. App. 275.   b.   The parties to a contract are presumed to have used the words in their ordinary sense.   Greason v. Railroad, 112 Mo. App. 116; Rogers v. Insurance Co., 131 Mo. App. 353.   c. When a technical trade word is used in a contract the law does not presume that it was used in its technical sense unless both parties to the contract are engaged in the business from which the word gets its peculiar meaning.   Gaunt v. Price, 21 Mo. App. 540; Long v. Armsby, 43 Mo. App. 253; Wall v. Bailey, 4 Sickles, 464.   (2)   The rule is that when words and phrases have a meaning only in connection with an art or calling, and no meaning otherwise, such word or phrases are to be given their technical meaning unless they were evidently used in a different sense, in which case the intention controls.   17 Am. & Eng. Ency. Law (2 Ed.), p. 13.   (3)   Where the language of a promisor may be understood in more senses than one, it is to be interpreted in the sense in which the promisor had reason to suppose it was understood by the promisee.   17 Am. & Eng. Ency. Law (2 Ed.), p. 17; Courts v. Medley, —— Mo. ——.   (4)   It was error to restrict the testimony of Dysart to the contradiction of Jenkins as it tended to show the construction placed

on the contract by the parties thereto and was admissible for that purpose. Del Bondio v. Packing Co., 79 Mo. App. 465; Carney v. Light Co., 76 Mo. App. 532; Nordyke v. Kehlor, 155 Mo. 643; St. Louis v. Gas Co., 155 Mo. 1; Halliday v. Lisch, 85 Mo. App. 285; Letley v. McElmurry, 201 Mo. 382; Meissner v. Equipment Co., 211 Mo. 112. (5)   The court erred in not reprimanding attorney for respondent for remarks which were outside of the legitimate scope of argument.   While considerable discretion is entrusted to the trial courts in preserving proper conduct during trials and preventing improper remarks to be made by counsel in arguments, yet such discretion is the subject of review.   Brown v. Railroad, 66 Mo. 588; Sidekum v. Railroad, 93 Mo. 400; Ritter v. Bank, 87 Mo. 574; State v. Barham, 82 Mo. 67; Haynes v. Trenton, 108 Mo. 123; Evans v. Trenton, 112 Mo. 390; Beck v. Railroad, 129 Mo. App. 7.

*Hamlin & Seawell* and *Frank B. Williams* for respondent.

(1)   This case does not include in its issues a custom, but merely the meaning of a technical term. Maupin & Co. v. Pries & Co., 21 Mo. App. 540.   (2) The parties are presumed to use the term "Tankage" according to the meaning attached to it in the garbage reduction business, in which they were both engaged.   Whitemore v. Coates, 14 Mo. 10.   (3) Where the words employed are not technical, they must be taken in their usual acceptation, but technical words will be taken in a technical sense unless they are clearly used in a different sense.   9 Cyc. 583; Bradshaw v. Bradbury, 64 Mo. 334; Greason v. Railway, 112 Mo. App. 129.   (4)   Trade or technical terms in a written contract may be explained by parol testimony.   Realty Co. v. Moynihan, 179 Mo. 640; Kimball v. Brawner, 47 Mo. App. 398; Fitzsimmons v. Christian Bros.,

81 Mo. 37; Sautier v. Kellerman, 18 Mo. 509; Blair
v. Corby, 37 Mo. 313; Evans v. Brass Mfg. Co., 118
Mo. 553; Conable v. Clark, 26 Mo. App. 173. (5) The
interpretation of writings is always for the court ex-
cept when they are ambiguous and the ambiguity
must be solved by extrinsic unconceded facts, and then
it is not for the court to draw these inferences but
for the jury. State v. Brown, 171 Mo. 487; Soap
Works v. Sayers, 55 Mo. App. 15; Chapman v. Rail-
way, 114 Mo. 542; Mantz v. Maguire, 52 Mo. App. 146;
Willard v. Seigle, 47 Mo. App. 1; Norton v. Higbee,
38 Mo. App. 467. (6) Under a general denial only
such proof as will meet and overthrow what the ad-
verse party is bound to prove in order to recover is
admissible. Jacobs v. Mosely, 91 Mo. 457; Scudder v.
Atwood, 55 Mo. App. 512; Huber v. Hunter, 87 Mo.
App. 50; Feeney v. Chapman, 89 Mo. App. 371; Bal-
ton v. Railroad, 172 Mo. 92. (7) Evidence of fraud,
accident or mistake, was not admissible under the
general denial of appellants, and if respondent pointed
out fertilizer to appellants and told them it was tank-
age and they were thereby deceived, such special de-
fense is not available to them because it was not ten-
dered in their answer. (8) Where fraud inters into
a contract the injured party has two remedies—to
stand on the contract and sue for damages or to re-
cind the contract and tender back what was received.
Appellants did neither. They simply denied the con-
version. Brown v. Mining Co., 231 Mo. 166; Ryan v.
Miller, 236 Mo. 496; Noel v. Hughes, 152 Mo. App.
192. (9) The alleged remarks of respondent's coun-
sel cannot be considered in this appeal because they
are not preserved in the bill of exceptions. But had
they been properly preserved, still they were justified
by the improper remarks of appellant's counsel made
concerning respondent. Fuller v. Robinson, 230 Mo.
55; Gibbs v. Power Co., 142 Mo. App. 19; Franklin
v. Railroad, 188 Mo. 545.

STURGIS, J.—The plaintiff recovered judgment against the defendants for the conversion of a quantity of fertilizer claimed to be his property. The defendants justified the conversion by asserting their own ownership to the same. This dispute as to ownership arose in this way. The plaintiff owned a plant for manufacturing fertilizer located near Springfield, Mo., his supply of raw material being largely obtained from gathering up dead animals, garbage, etc., in that city. In the spring of 1910, after some negotiations, the defendant Dysart concluded to buy an interest in this business with plaintiff and to that end they agreed to organize the defendant corporation, Springfield Reduction and Chemical Company, to take over the old plant of the plaintiff and enlarge the same and thereafter the corporation would own the plant and conduct the business. In the organization of this corporation the defendant Dysart and one Cook, a relative of his, took a majority of the stock and thereafter Dysart dominated and controlled the business. This explains why he was held jointly with the defendant corporation for the conversion of the fertilizer in question.

As a preliminary to the formation of the defendant corporation and its taking over the plaintiff's property, the plaintiff and defendant Dysart entered into the following contract:

This contract, made and entered into by and between J. C. Dysart, party of the first part, and T. J. Jenkins, party of the second part, both of Greene county, Missouri, WITNESSETH:

That the parties of the first and second part do hereby agree to form a corporation for the purpose of taking over a contract heretofore entered into by and between J. C. Dysart, and the city of Springfield, Missouri, wherein the said Dysart contracted with the said city to remove and reduce garbage and dead animals, and other things and matters contained in said contract, for the period of ten years from the first day

of May, 1910; it is mutually agreed that said corporation shall be incorporated for the sum of $15,000, $9,000 of which capital stock shall be taken by said Dysart, or parties that he may designate, and the remaining $6,000 shall be taken by said Jenkins or parties he may designate.

It is further agreed, that when the corporation is formed it shall buy and take over all of said Jenkin's tools, machinery and appliances and equipment of the Jenkins' Garbage and Reduction Plant, at the sum of $2500, and the corporation when formed shall take over the *tankage* now owned by said Jenkins located at said plant, estimated to be about 200 tons; said tankage to be taken over at $2200, and said Jenkins shall receive $6000 stock of said corporation therefor.

It is further agreed that said Dysart shall put into said company in cash, $5000; that the contract now held by Dysart shall be transferred to said company at a price and sum of $5300, and the said Dysart shall receive $9000 of the capital stock therefor.

.   .   .   .   .   .   .   .   .   .   .   .

This contract executed in duplicate this 26th day of March, 1910.

J. C. DYSART,
T. J. JENKINS.

The dispute in this case grew out of the question whether or not the product in dispute, designated as fertilizer in the petition, passed under this contract to the defendant corporation and became its property or whether it remained the property of the plaintiff.

The evidence shows that at the time this contract was entered into there was at the plant a considerable amount of the finished product in sacks and all parties agree that this is fertilizer and not "tankage" and remained the property of the plaintiff. There was also considerable amount of the raw mate-

rial or semi-raw material, which all parties agree passed to the defendant under the name of "tankage." There was also in bins or sheds a considerable amount of the product designated by one witness as "ground tankage" but which had all the ingredients of the finished product and differed in no way from the fertilizer in the sacks. All that needed to be done to put this product on the market was to put it in sacks. This is the product that is in dispute and is claimed by the defendants to have passed to the corporation as "tankage" or otherwise under the contract mentioned and became its property. There is no question but that if this product was the property of plaintiff, then the defendants converted it to its own use.

As bearing on the meaning of the word tankage, the evidence of both parties shows that in the process of manufacturing fertilizer large cooking-tanks are used in which the dead animals, garbage, etc., are cooked for the purpose of extracting the fats and the residue is then dried and used in making the finished product. The defendants' witness Black described the process of making the product in the bins and which is now in dispute, as follows: "After that material is dried, we take it out and throw it into a pile, until it can be ground into fertilizer. When we grind fertilizer, we take 666 lbs. of tankage to 1000 lbs. of fertilizer. The other 333 lbs. is composed of phosphoric acid and chicken manure. We grind that up in a crusher and pass it into a bin; from the bin it is put into sacks; when it comes out of the mill it is in the same condition as when it goes into the sacks. That is fertilizer."

I. The greatest difficulty in this case arises from the fact that neither party seems to have tried it on any definite theory. In the defendants' brief in this court, it is said: "The vital issue of fact in this case

was, or ought to have been, whether the word tankage in the said contract was used in its ordinary sense, or in its purported trade or technical sense.'' If the word has an ordinary and common meaning, then it would not be necessary or. proper to introduce extrinsic evidence to show what that meaning is. We find that defendants at first took this position in the trial court. On the examination of the witness McCollum, who is shown to be the party who wrote the contract in question, the following took place: ''Q. Did Mr. Jenkins explain to Mr. Dysart the meaning of the term tankage in this contract? A. I think he did, I don't know. By Mr. Patterson: We object to that; it has a well defined meaning; which objection is by the court sustained. Q. What was said, if anything, about the fertilizer, or finished product? By Mr. Patterson: We object to that, the contract speaks for itself; which objection is by the court overruled, to which ruling defendant excepts. Q. What was the finished product called, and who owned it? By Mr. Watson: Same objection; which objection is by the court sustained. By the Court: Q. This was prior to the making of the contract? A. Yes, sir. By the Court: Then I will let you answer that. By Mr. Patterson: We object to that for the reason that the contract speaks for itself; we admit that he owned it before the contract was drawn up. Q. What was said about who was to have the fertilizer when they agreed to trade? By Mr. Petterson: We object to that, the. contract shows for itself; which objection is by the court sustained, to which ruling plaintiff excepts. By Mr. Williams for plaintiff: Plaintiff offers to show by the witness that during the negotiations between the parties, and prior to the signing of this contract, that the parties agreed that the finished product was to be, and remain the property of the plaintiff and that the raw material, as described by this witness was called tankage, was to be the property of the corpora-

tion; and that the parties understood tankage as raw material, and not finished product; to which defendant objects, which objection is sustained, to which ruling plaintiff excepts."

It will thus be seen that the defendants took the position and maintained it successfully at the commencement of the trial that extrinsic evidence could not be introduced to show the understanding of the parties as to the meaning of the term tankage as used in the contract, or to show by such evidence what particular kind of product was or was not included in this term at the time the contract was in the process of being made. Later in the trial, after the parties had introduced some expert evidence as to the meaning of the word tankage, the court permitted the defendant Dysart to state that the plaintiff had pointed out certain products, inclusive of that now in dispute, as being tankage and included within that term. This was done on the theory that this evidence tended to contradict the evidence given by plaintiff as to the meaning of the word tankage and was limited to this purpose only by an instruction given at the plaintiff's instance. On the same theory the witness McCollum was also recalled and allowed to testify as to what was said by the parties on this subject at the time the contract was being made. It will be seen, however, that, in this the court was merely adopting the theory first taken by the defendants that the word tankage was to be taken either in its ordinary meaning or in its trade meaning, and that it was a question for the jury to determine which meaning was used by the parties and from this to determine whether or not the product now in dispute was or was not included within the meaning of this term; but that it was not competent to prove by any witness that the plaintiff pointed out or by the express understanding of the parties that this particular product was to be included and passed to defendants under the name of tankage.

As adopting this same theory of the case, we think the evidence of the defendant Dysart᾽ clearly shows that he understood the difference between the word tankage and fertilizer, and that the product now in dispute is not properly tankage but is fertilizer, and that he was claiming the same, not as being included and passing by the contract as tankage, but that he was claiming it in addition to and outside of what was sold as tankage. Witness this evidence: ''Q. At the time that this contract of March 26th was entered into by you and Mr. Jenkins, didn't he tell you at that time, that he claimed all the fertilizer out there at the plant? A. No, sir. Q. Didn't he make this claim in the presence of Mr. McCollum? A. No, sir, he did not, everything was supposed to go in, and he was to have six hundred sacks, and he was to move that off immediately. Q. That was not mentioned in the contract at all? A. No, sir; what was left there, we was supposed to be in possession of, and this four or six hundred sacks was to be moved from there immediately after March 26th. Q. Isn't it a fact that in the presence of Mr. McCollum, when Mr. Jenkins was present, and you was present, isn't it a fact that you told Mr. Jenkins that you didn't want his finished product, and that you would take only the tankage? A. No, sir, it is not. Q. Isn't it a fact, that in Mr. McCollum's presence, you told Mr. Jenkins that you wouldn't take any product out there but the tankage, that you would take the tankage and grind it up, but he could keep his fertilizer? A. No, sir, I did not.''

We think it is clear from this evidence of the defendant Dysart that he was not claiming that this unsacked fertilizer passed to the defendant corporation as ''tankage'' and that he was purchasing it under that name, but that he was claiming it as *fertilizer* and seeking to show that the contract as made included all the fertilizer on hand except six hundred sacks, which the plaintiff retained and was to move at once.

In this he was seeking to change, add to and vary the written contract. Under all the authorities this would not be permissible. [17 Cyc. 608, 675; Lewis v. Muse, 130 Mo. App. 194, 108 S. W. 1107; O'Brien v. Ash, 169 Mo. 283, 295, 69 S. W. 8; 1 Ency. Evidence 832, note 11; Fruin v. Railroad, 89 Mo. 397, 404, 14 S. W. 557.]

Having maintained his position, that it was not permissible to show by extrinsic evidence that any particular product was or was not by the understanding of the parties at the time the contract was made included in the word tankage or excluded therefrom, the defendants cannot now change their position and put the court in error for having adopted this theory, either in the admission of evidence or in the instruction limiting similar evidence to another purpose. Parties are bound on an appeal by the position which they successfully assumed in the trial court. [Reiger v. Faber, 116 Mo. App. 129, 92 S. W. 183; Bensieck v. Cook, 110 Mo. l. c. 182, 19 S. W. 642; McClanahan v. West, 100 Mo. l. c. 322, 13 S. W. 674; Carp v. Insurance Co., 203 Mo. 295, 101 S. W. 78; 16 Cyc. 796.]

In Benseick v. Cook, 110 Mo. l. c. 182, 19 S. W. 642, the court said: "Courts of justice cannot be trifled with in this way. Parties litigant are not allowed to assume inconsistent positions in court; to play fast and loose; to blow hot and cold. Having elected to adopt a certain course of action, they will be confined to that course which they adopt."

The defendants also maintain the position that words are presumed to be used in their ordinary sense and that the court erred in refusing to so instruct the jury in this case. We very much doubt whether the word tankage, appearing in this contract, would have any meaning at all to the ordinary man having no knowledge of the process of making fertilizer. It acquires a meaning only as he would

consult an unabridged dictionary or become acquaint-
ed with the method of manufacturing fertilizer. It is
unquestionably such a technical term as demands some
explanation. Evidently what the defendants mean by
saying that it should be taken in its usual and ordinary
sense is that its meaning is to be determined by con-
sulting the unabridged dictionaries. The defendants
cite as showing the common, ordinary meaning of the
word "tankage" the definition given it in Webster's
New International Dictionary, which is, "Waste mat-
ter from tanks, especially the dried, nitrogenous resi-
due from tanks in which fat has been rendered, used
as a fertilizer." The plaintiff on the contrary cites
the definition given in the Standard Twentieth Cen-
tury Dictionary, which is, "The residuum obtained in
rendering refuse fats, etc., used, when dried, as a fer-
tilizer or as a course food." We think there is no sub-
stantial difference between these two definitions and
if the court and jury had adopted such definitions of
tankage, especially the one given by Webster, and had
applied it to the particular product now in dispute, it
is apparent that this product could not have been al-
lowed by this court to have passed to the defendants
under this contract. Under all the evidence it must
be conceded that the product in question is not "Waste
matter from tanks, especially the dried, nitrogenous
residue from tanks in which fat has been rendered."
Two-thirds of it was before mixing with other ingredi-
ents such waste matter or residue from the tanks in
which fats had been rendered. The other one-third
is composed of entirely different products, having
nothing to do with the tanks or the residue left from
the materials rendered in the tanks. It is also true
that the two-thirds taken from the refuse of the tanks
might, to some extent, have been used as a fertilizer
without mixing it with other ingredients. So might
the other products mixed with it. It contained one

169 Mo. App.—35

element, but substantially only one element, necessary to make a commercial fertilizer. It was only when mixed with other ingredients, comprising one-third of the total bulk, that it became commercial fertilizer. The product now in dispute is the mixed and completed product and is quite different from the refuse of the tanks before being mixed with other ingredients.

Under this view of the case the judgment must be affirmed.

II.   The writer of this opinion thinks that it is but just and fair to the parties litigant, and in order that this opinion may not be misunderstood, to say that had the defendants tried the case throughout on the theory that the word ''tankage'' is necessarily used in this contract as a technical term that demands an explanation by extrinsic evidence; that the parties themselves agreed and understood at the time and that plaintiff pointed out and designated this loose product in the bins as being ''tankage'' and being sold under that name; and that defendants bought this product under the name of tankage; then it would have been proper to have admitted evidence to this effect and to have left it to the jury, under proper instructions, to determine whether this particular product was or was not included within that term as used in the contract.  On this theory it would have been error for the court to give instruction number two, given for plaintiff, limiting the purpose of such evidence to the mere purpose of contradicting plaintiff's evidence as to the meaning of the word ''tankage;'' and the court should then have given instruction number four, asked by the defendants, permitting the jury to determine the meaning of the term from the conduct of the parties and any statement made by either of them, showing the meaning they placed on the contract at the time.

It can hardly be said, as claimed by plaintiff, that both parties agree and their expert testimony all shows that the term "tankage" has a *well defined* trade meaning, because each party introduced one expert witness, who stated that it had a well defined trade meaning and then each proceeded to give a *different* meaning. That the term may have a trade meaning is fairly deducible from this evidence but as to it being well defined, we think the evidence would rather show to the contrary. It is true that a commercial term, used in any particular trade and having acquired a meaning in connection with that trade, is presumed to be used with such meaning, when used in connection with such trade. [Long Bros. v. The Armsby Co., 43 Mo. App. 253, 264-5; Whitmore v. Coates, 14 Mo. 10.]

Yet, such rule is not applicable to this case because this transaction was not the buying or selling of a product in the course of commercial trade. It is not a case where a buyer went on the general market to buy a particular commodity from one engaged in the business of buying and selling such commodity on the market, where the commercial term is constantly used in connection with the sale of that particular commodity. This case falls within the class of cases where in an ordinary transaction an ambiguous term is used and the parties are permitted to introduce extraneous evidence and circumstances to show its meaning. In regard to such cases, it is said in 1 Ency. of Evidence, 837, 838: "So, if the previous negotiations make it manifest in what sense the parties understood and used the ambiguous terms in the writing, they may be resorted to, and indeed, they furnish the best definition to be applied in ascertaining the intention of the parties. Within the rule of admitting evidence of surrounding facts and circumstances to aid or explain an ambiguity, it has been held proper to receive evidence or declarations of the parties tending to show

what they understood the ambiguous term or expression to mean.'' And on page 841, it is further said, ''Such evidence neither varies nor adds to the writing, but merely translates it from the language of the trade or art in question, into the ordinary language of people generally.'' [Gaunt v. Pries & Co., 21 Mo. App. 540.]

In Greason v. Railroad, 112 Mo. App. 116, 129, 86 S. W. 722, the court said, ''That rule of law (that extrinsic evidence may be received to identify the sub-ject-matter of an ambiguous contract) is employed to ascertain what property was intended by an agreement in reference to some particular property too loosely described to be identified from the description alone. Thus if a contract of sale described the thing sold indefinitely, it may, within limits, be helped out by extrinsic evidence.''

In 17 Cyc. 669, it is said, ''The conversations and statements of the parties at the time of, or just previous to, the execution of the contract between them may be admissible for the purpose of aiding in the construction of the writing.'' [See, also, 17 Cyc. 671, 675.]

In Quarry Company v. Clements, 38 Ohio St. 587, 43 Am. Rep. 442, 443, the following quotation is taken from Lord CAMPBELL in the English case of McDonald v. Longbottom, 102 Eng. Com. Law, 977, ''There cannot be the slightest objection to the admission of evidence of previous conversations, which neither alters nor adds to the written contract, but merely enables us to ascertain what was the subject-matter referred to therein.'' This case, and the many cases cited therein, shows clearly the application of this doctrine to the present case. [See, also, Thompson on Trials, 1 Ed., page 838, section 1081; Keller v. Webb, 28 Amer. Rep. 209.]

As the defendants did not try the case on this theory, at least at the outset of the trial, and the de-

fendant Dysart did not claim the product now in question as being tankage but sought to claim it as fertilizer, thus seeking to add to and vary the terms of the written contract, it is not necessary to pursue this theory of the case further.

The judgment will be affirmed. *Farrington, J.,* concurs in a separate opinion. *Robertson, P. J.,* concurs in paragraph I, but expresses no opinion on paragraph II.

## SEPARATE CONCURRING OPINION.

FARRINGTON, J.—I concur in section I of the opinion of Judge STURGIS, and concur in the result reached in his opinion affirming the judgment. As to section II of his opinion concerning the construction to be placed on the word "tankage," used in the contract, I am of the opinion that when this word was used in the written contract the parties knew, or must have known, that it had a technical trade meaning and were bound by the limits and scope of that meaning. [Heyworth y. Miller Grain & Elevator Co., 174 Mo. 171, 185, 73 S. W. 498.] To parties engaged in the fertilizer business, the word "tankage" has a well-defined meaning, and when used in a written contract by parties engaged in that particular business, to allow either of them to introduce oral evidence which would vary or modify that particular trade meaning would be as erroneous as to admit oral testimony to vary terms of a written contract where all the words have a general, well-defined, meaning, and are not used as trade terms. The instructions of the trial court, to my mind, put the question fairly to the jury.