59 F.Supp. 21 (1945)
THOMPSON et al.
v.
BALTIMORE & O. R. CO. et al.
No. 2456.
District Court, E. D. Missouri, E. D.
February 2, 1945.
*22 *23 B. F. Batts, H. H. Larimore, S. G. Ray, and M. G. Roberts, all of St. Louis, Mo., for plaintiffs.
Douglas F. Smith, Kenneth F. Burgess, and Robert A. Sprecher, all of Chicago, Ill., Wilton D. Chapman and E. C. Hartman, both of St. Louis, Mo., Guernsey Orcutt, of Philadelphia, Pa., T. P. Healy, of New York City, and George C. Doering, of Baltimore, Md., for defendants.
HULEN, District Judge.
By this action, the railroads who are plaintiffs seek a declaratory judgment holding that by virtue of a certain written instrument known as "Joint Division Sheet No. 200-A" the railroads, parties to this action, are required to make a division of rates or revenue resulting from land grant shipments on the basis of the percentages set out in "Joint Division Sheet No. 200-A". The defendants by answer, in effect, pray for a declaratory judgment to the contrary.[1] Plaintiffs are western lines, operating in the Southwest Freight Bureau Territory. Defendants are eastern lines, operating in Central Freight Association Territory, with the Mississippi River as the approximate dividing line.[2]
The complaint refers to the execution by all parties to this case of "land grant or equalization agreements" with the Government, and alleges:
"That said freight land grant equalization agreements were in full force and effect at all times herein mentioned, and that by virtue thereof and the practices of the carriers thereunder, the said land grant rates over non-land grant, competing or equalizing routes constitute joint rates * * *"
The complaint then alleges that Joint Division Sheet No. 200-A is a contract entered into "on April 1, 1940," by the parties plaintiff and defendant (with other roads) "to avoid and prevent future controversies as to the apportionment of the revenue derived from all traffic moving under joint rates between the Territories aforesaid, including those in effect between points on the lines of plaintiffs and defendants herein, * * * fixing and determining the percentages to be thereafter used in dividing the revenue received for the transportation of all traffic moving under joint class or commodity rates between points in the two Territories aforesaid" (Page 6, Complaint)
Defendants deny the position of plaintiffs and charge:
"By its existing freight land grant equalization agreement with the Government of the United States each of the defendants has strictly limited its participation in reduced rates granted to the Government and the measure of such reduced rates, as follows:
"`(d) The participation of this carrier in rates derived through land-grant deductions is subject to the limitation that *24 this carrier will participate only in deductions for the land-grant mileages within Central Freight Association territory of the lines of railroad in the southern peninsula of Michigan and of the Illinois Central within Illinois between Chicago and Cairo and between Minonk and Centralia, both inclusive.'
"The defendants have never at any time made any agreement with the plaintiffs that defendants would participate in bearing any land grant deductions accruing from land grant mileage within plaintiffs' own rate territory, or an agreement of any character with the plaintiffs governing or relating to the net compensation to be received by the defendants or by the plaintiffs from the transportation of the Government freight traffic referred to in the complaint. On the contrary, the compensation due and payable to the plaintiffs and to the defendants, and each of them, for the transportation of such freight is fixed and determined solely by the said respective equalization agreements of the respective parties and by operation of law." (Page 3 of Answer)
The dispute between the plaintiffs and defendants as to the proper division of revenue derived from land grant rates, has existed for many years,[3] as between plaintiffs Missouri Pacific and St. Louis Southwestern Railway Company and defendants since 1934, as between the remaining plaintiff and defendants since 1942.
On certain Government traffic (military or naval property of the United States moving for military or naval and not for civil use) moving over "land grant roads" the Government is by law entitled to what is known as "land grant deductions." This results from the policy of the Government during the building or expansion period of railroads, in granting to certain railroads public lands upon which to build rights-of-way. The lines constructed over lands thus granted by the Government to the railroads are known as "land grant mileage." The Laws of the United States[4] now provide that the Government will not be required to pay in excess of fifty per cent of the lowest rate paid by the public, or the lowest commercial rate, for transportation of Government property over "land grant mileage." This is on the hypothesis that the Government, by the land grant, has helped to construct the land grant mileage, and that by such assistance, has paid in advance a portion of the rate, and when it pays the reduced or land grant rate, it is thereby paying the unpaid portion of the transportation charge for Government property over the land grant mileage.[5] The reduced rate charged the Government for this transportation is known as a "land grant rate."
"However, there are scores, if not hundreds, of other railroad routes in existence between the Territories aforesaid to which the land grant rates do not apply as a matter *25 of law and compulsion. In order to have the benefit of participating in the transportation of such Government freight as above defined under land grant rates over other than land grant routes, commonly referred to as non-land grant, competing or equalizing routes, each of the parties hereto or their predecessors in interest, long prior to April 1, 1940, severally entered into a certain written contract or agreement with the War Department of the United States. These contracts are known as `freight land grant equalization agreements.' They provide that the parties thereto, together with other common carriers, shall accept for transportation over non-land grant, competing or equalizing routes, such Government freight at the lowest net rates lawfully available as derived through deductions on account of land grant distances from commercial rates as aforesaid, applying from point of origin to point of destination at the time of movement over land grant routes." (Page 8 of complaint)
Plaintiffs and defendants have had, not joint but individual, land grant agreements with the Government for over forty years.[6] For the purpose of arriving at the land grant rate, the Government has always divided the Commercial rate east and west of the river on a territorial basis and determined the land grant deductions due the Government over the respective east and west lines separately. For over thirty years each of the parties to this case, regardless of which were the collecting or settling carrier, carried the land grant deduction in the territory served by it. In 1934 the defendants made some changes in their land grant agreements with the Government. Basing its action on these changes in land grant agreements by the defendants with the Government, two of the plaintiffs (Missouri Pacific Lines and St. Louis Southwestern Railway) thereupon commenced to pass on to the eastern lines part of the land grant deductions made on the western lines, in cases where they were the collecting carrier. In 1942 the other plaintiff took up the practice, in a general way, in cases where it was the collecting carrier. The defendants have consistently at all times settled with western lines, and insisted they should do likewise, on the territorial basis, as was the practice of all the parties prior to 1934.
As a consequence of this difference and dispute as to division of revenue derived from traffic moving under land grant rates, where the shipment originates on defendants' lines, and terminates on plaintiffs' lines in Southwest territory, and plaintiffs are the collecting carriers, the plaintiffs now divide the land grant rates or revenues according to percentages set out in Joint Division Sheet No. 200-A. When the shipment originates on the plaintiffs' lines, and moves over into Central territory on defendants' lines, and the defendants are the collecting carriers, the defendants now divide the revenue on the territorial basis; that is, on the basis of deductions for land grant mileage in the respective territories.
The making of land grant rates is a complicated mathematical problem. The Government first ascertains the route between the territories containing the greatest amount of land grant mileage, in order to obtain the lowest land grant route. This route is known as a basic or governing route. Having determined the route which includes the greatest amount of land grant mileage, there is deducted from the lowest published or commercial rate an amount equal to 50% of that part of the commercial rate that is applicable to that part of the governing route that is composed of land grant mileage. After these deductions are made, under the mandate of the federal statute, the amount resulting or left is the land grant rate from A to B. If a shipment travels over a "competing route" instead of the "governing route" on a railroad that had entered into a land grant equalization agreement, it would be carried under the land grant agreement at the same rate or charge as the land grant rate. Only the governing route is compelled to carry the Government's freight at the land grant rate. The making of land grant agreements by competing lines is purely voluntary.
On most Government shipments traveling on land grant rates, whether over *26 competitive or governing route, there are more land grant deductions available to the Government in the Southwestern territory than in Central territory. Under these circumstances if the division of the land grant rate is made under Joint Division Sheet No. 200-A, plaintiffs receive a larger percentage of the revenue in the division of the rate than if the division had been made on a territorial basis, because a part of the land grant deduction for land grant mileage in the southwest territory is passed from the carriers in Southwestern territory to carriers in Central territory. Specifically it is this transfer, from west to east, of land grant deductions that is the crux of this case.
A simple example in an assumed case will demonstrate the manner of transfer of the land grant deduction, where Joint Division Sheet No. 200-A is used in division of land grant rates: Assuming a joint through rate of 100 cents from a point in Southwest territory to a point in Central territory; first, the through rate is broken down by the Government on the territorial basis to ascertain the per cent of the commercial rate due the carriers in each territory. This is done by using the commercial divisions of Joint Division Sheet No. 200-A and is required by order of the War Department.[7] Assume that Joint Division Sheet No. 200-A provides for a division of the revenue of 50% to the eastern roads and 50% to the western roads; assume that the land grant deduction on this shipment is ten cents in the Central territory and twenty cents in the Southwestern territory. Under the defendants' method of division, or the territorial basis, that is each territory carrying the land grant deductions, in the respective territories, defendants' distributive share of the revenue would be forty cents and the plaintiffs' distributive share would be thirty cents. On the same shipment, if the revenue derived from the net land grant rate were divided on plaintiffs' theory, or according to Joint Division Sheet No. 200-A, the eastern lines would receive thirty-five cents and the western lines a like sum, notwithstanding the land grant deductions were twice as much on the western lines as on the eastern lines.

 Difference Between Defendants' And
 Plaintiffs' Method of Settlement[8]
Assumed Joint Through Rate  100 Cents
Assumed Divisions (Joint Div. Sheet No. 200-A) 50% to East Roads
 50% to West Roads
 Defendants' Basis 
1. Rate Divides 50¢ East 50¢ West
2. Land Grant Deduction 10¢ East 20¢ West
 ___ ___
3. Defendants Would Distribute
 Revenue 40¢ East 30¢ West .... 70¢
 Plaintiffs' Basis 
4. Rate Divides 50¢ East 50¢ West
5. 50% of 30¢ (Sum of Land
 Grant Deductions) 15¢ East 15¢ West
 ___ ___
6. Plaintiffs Would Distribute
 Revenue 35¢ East 35¢ West .... 70¢
7. 50% of "Net Rate" of 70¢ 35¢ East 35¢ West

*27 Evidencing the actual result of such divisions is Exhibit 13, showing "representative" shipments from points of origin and destination in the two territories. Column one lists point of origin and destination; column two shows per cent of revenue received by plaintiffs (west of gateways) and per cent received by defendants (east of gateways) if the division of the revenue or land grant rate is made as set in Joint Division Sheet No. 200-A, or as plaintiffs make divisions where they are the collecting or settling carriers. Column three shows the per cent of revenue or land grant rate received by plaintiffs (west) and defendants (east) where the division is made on a territorial basis, as defendants make divisions, where they are the collecting or settling carrier.

Column 1 Column 2 Column 3
 Proportions of Revenue Proportions of Revenue
 at Land Grant Rates at Land Grant Rates
 on Basis of Division on Territorial Divisional
 Sheet 200-A Basis.
Origin and Destination West of East of West of East of
 Gateways Gateways Gateways Gateways
 (Plaintiffs) (Defendants) (Plaintiffs) (Defendants)
Newburg, Mo. and
 New York, N. Y. 32% 68% 23.83% 76.17%
Mt. Vernon, Mo., and
 New Cumberland, Pa. 42 58 27.64 72.36
Bentonville, Ark., and
 Philadelphia, Pa. 42 58 34.62 65.38
Van Buren, Ark., and
 Philadelphia, Pa. 46 54 28.76 71.24
Tulsa, Okla., and
 Columbus, Ohio 57 43 54.71 45.29
Oklahoma City, Okla., and
 Newark, N. J. 48 52 42.52 57.48
Gideon, Mo., and
 Schenectady, N. Y. 36 64 30.66 69.34
Springfield, Mo., and
 Iona Island, N. Y. 38 62 27.57 72.43
Osceola, Ark., and
 Battle Creek, Mich. 54 46 48.50 51.50
Springdale, Ark., and
 Schenectady, N. Y. 42 58 33.99 66.01
Tulsa, Okla., and
 Brooklyn, N. Y. 45 55 37.65 62.35
Oklahoma City, Okla., and
 Jeffersonville, Ind. 65 35 60.13 39.87

*28 Reducing the same shipments as shown above to total revenue received and showing actual division of the revenue under the land grant rate, we get the following result:

Column 1 Column 2 Column 3
Total Revenue Divisions Under Percentages Divisions Under
 Under in Joint Territorial Basis
Land Grant Division Sheet 200-A
 Rates West of East of West of East of
 Gateways Gateways Gateways Gateways
 (Plaintiffs) (Defendants) (Plaintiffs) (Defendants)
475.20 152.06 323.14 113.23 361.97
405.99 170.52 235.47 112.20 293.79
427.00 179.34 247.66 147.82 279.18
363.19 167.07 196.12 104.47 258.72
405.28 231.01 174.27 221.74 183.54
586.54 281.54 305.00 249.39 337.15
387.65 139.55 248.10 118.85 268.80
203.12 77.19 125.93 56.01 147.11
600.38 324.21 276.17 291.17 309.21
427.43 179.52 247.91 145.29 282.14
503.53 226.59 276.94 189.58 313.95
440.18 286.12 154.06 264.70 175.48

Reduced to its foundation plaintiffs' position, that land grant rates are joint rates and that Joint Division Sheet No. 200-A is a contract between the parties hereto that controls the division of those rates, presents the proposition that by virtue of the freight land grant equalization agreements filed with the War Department by all the parties, land grant rates become joint rates and that it was the intention of the parties in entering into Joint Division Sheet No. 200-A to agree on the division of such joint rates, together will all other joint rates.
Plaintiffs assert the affirmative of these issues and therefore plaintiffs must carry the burden of proof. That this is a suit for a declaratory judgment does not change the rule. We quote from a case involving a declaratory judgment:
"It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action." Reliance Life Ins. Co. v. Burgess, 8 Cir., 1940, 112 F.2d 234, loc.cit. 237, 238, reh. denied, 1940, 311 U.S. 730, 61 S.Ct. 391, 85 L.Ed. 475.
This case involves large sums of money, other cases are pending or contemplated on the same or similar issues, the parties have gone to great expense in preparing their case and have, by able and eminent counsel, presented and briefed it with meticulous care. A full discussion and decision on the issues presented is called for.
By answer of plaintiffs to interrogatories, and reiterated in brief filed by them, they state their position that land grant rates are joint rates by virtue of the equalization agreements filed by the defendants with the War Department in 1934, as follows:
"* * * these plaintiffs state that the practices of the defendants by virtue of which the land grant rates over non-land grant, competing or equalizing routes constitute joint rates within the meaning of the contract (Joint Division Sheet 200-A) described in the complaint, are as follows:
"Defendants severally entered into a written contract or agreement with the War Department of the United States, known as a `freight land grant equalization agreement.' In said contract or agreement with the War Department, the defendants, with other common carriers by railroad, including these plaintiffs, agreed to accept for transportation over non-land grant, competing or equalizing routes such *29 Government freight at the lowest net rates lawfully available as derived through deductions, on account of land grant distances, from commercial rates applying from point of origin to point of destination at the time of movement over land grant routes.
"By entering into contracts with the War Department as aforesaid, defendants assumed the responsibility of dividing the net land grant rates, after April 1, 1940, in accordance with the provisions of Joint Division Sheet No. 200-A attached to the complaint herein."
What were the terms of the land grant agreements between the defendants and the Government prior to 1934, what changes were made in those agreements in 1934, and the effect of those changes as they may or may not have affected the character of the rate thereby created? The land grant agreements of all defendants executed in 1934 are substantially the same in their terms.
By paragraph One of those land grant agreements they agree "to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State Commissions applying from point of origin to destination at time of movement."
Sub-paragraph (a) of Paragraph 2 of the Agreement restricts application of the agreement on traffic destined to or received from points on lines of other carriers, that the agreement will apply "in connection with such carriers as have agreements" as set out above. Comparing the 1934 land grant agreements of defendants with those in effect prior thereto, we find they contain language substantially the same as paragraphs 1 and 2(a) of the 1934 agreement. (See Exhibits V-1 and B-2). Sub-paragraph (b) of Paragraph 2 provides the agreement is subject to the exceptions in the agreements of each individual carrier forming a part of the through route of movement." Sub-paragraph (c) of Paragraph 3 provides that the provision of sub-paragraph (b) of Paragraph 2 "shall not operate to restrict equalization to or from junctions with said Central Freight Association carriers." We note particularly paragraph three: "that any land grant deductions which are not participated in by any of said carriers (Trunk Line, New England Freight Association Carriers) by reason of their not having freight land-grant equalization agreements on file with the Quartermaster General, War Department, Washington, D. C., will be absorbed by agreement carriers participating in the through movement," provided that the carrier participating in the through movement "has a freight land grant equalization agreement containing this exception." Paragraph three is the sole reference in the land grant agreements to the subject of absorbing land grant deductions on lines other than Central Freight Association territory carriers. The rule "Expressio unius est exclusio alterius" could well be applied to the contract in this particular. Certainly it evidences the intention of the contracting parties. It lends no aid to plaintiffs' claim that defendants are required to absorb land grant deductions in Southwestern territory under the terms of their 1934 land grant agreements.
The reason why defendants changed the terms of their land grant agreements with the War Department in 1934 was given by witness Howard, Assistant General Freight Agent of the Pennsylvania Railroad. Mr. Howard's statement was not disputed nor challenged by the plaintiffs. It is as follows:
"The condition that led up to the change that was made in the Pennsylvania Railroad agreement in 1934 might best be explained by describing the situation as existed prior to 1934 in the lower peninsula of Michigan and the State of Illinois. Considering first the conditions in the State of Michigan lower peninsula prior to 1934, no Central Freight Association Line had filed an agreement that equalized all of the land grant mileage in Central Freight Association Territory. This is true both as to Michigan and Illinois. The limitations in the agreement were taken care of or provided by means of exceptions carried in the individual agreement. Those exceptions were stated either in an affirmative or a negative form. By that, I mean that these exceptions provided that a certain line would or would not equalize certain land-grant mileage.
*30 "To illustrate, the agreement of the Pennsylvania Railroad that provided affirmatively that it would equalize the land-grant mileage of the Pere Marquette Railroad between Flint, Michigan and Ludington, Michigan, and it would also equalize the land-grant mileage of the Grand Trunk Railway between Port Huron and Flint, Michigan. At the same time, the equalization agreement with the Michigan Central which is now a part of the New York Central, provided negatively that it would not equalize the land-grant mileage of the Pere Marquette, nor would it equalize the land-grant mileage of the G. R. & I., now a part of the Pennsylvania.
"The often conflicting conditions and statements in the exceptions were very confusing to the Government, as well as to the railroads themselves, and they constantly led up to changes that were being made very rapidly. During a period of just a little over two years immediately prior to the changes that were made in 1934, one of the plaintiff lines, the New York Central System, made no less, or field no less than twelve new agreements with the Government during that period of approximately two years."
Q. "Well, did those several changes involve a measure of the land-grant deductions which they would equalize in the State of Michigan or in the State of Illinois, or was it both?" A. "They involved both; in other words, the individual agreements of the Central Freight Association Lines took care, and took care only, of equalization in those two states of Michigan and Illinois. They never did go beyond that. The situation in the State of Illinois was the same, that is, so far as the changes that were being made, the early agreements of the Central Freight Association Lines limited the equalization of land-grant mileage in Illinois to that section of the Illinois Central Railroad between Kankakee, Illinois and Chicago, a distance of 54 miles. The various Government agencies that made use of the equalization agreements were constantly developing new routes whereby they could utilize a greater segment of the Illinois Central land-grant mileage and thereby obtain a correspondingly lower net charge to the Government. There were quite a number of these instances developed, and as they were developed, there was a scramble on the part of the Central Freight Association Lines to amend their agreements and provide for another exception to equalize this new route or that new route as they were developed.
"During a period of from eight to ten years prior to the time the changes were made in the 1934 agreement, various Government officers, principally in the War Department, were using every method at their command to induce the Central Freight Association Lines to stabilize and simplify the agreements as they existed at the time. They asked that the Central Freight Association Lines eliminate what they called exceptions to exceptions, because they were unable to properly interpret the agreements, and they were not sure whether one Central Freight Association Line could handle traffic on a competitive basis with another Central Freight Association Line. The condition reached the point in 1934 where neither the Government nor the railroads themselves knew just where they stood, and the pressure was so great that the Central Freight Association Lines decided to comply with the request of the Government to eliminate the exceptions covering land-grant equalization in the State of Illinois and in the lower peninsula of Michigan, thereby placing all Central Freight Association Lines on a parity, one with the other, in competition on Government traffic moving within Central Freight Association Territory, and that action was taken during the fall of 1934.
Such were the changes, and such were the causes for the changes. Neither related to conditions in Southwestern territory or land grant agreements of plaintiffs or any other western carrier. Plaintiffs were not consulted about the changes made by the defendants in their land grant agreements with the Government. There is no evidence that the plaintiffs knew of the changes until the contracts were executed and filed with the War Department.
There is no provision in defendants' land grant agreements which, on their face, can be construed as a contractual obligation by the defendants to absorb land grant deductions in the territory of the plaintiffs or by which land grant rates are converted into joint rates. This interpretation is observed in the conduct of one of the plaintiffs (St. Louis San Francisco Railway Company) in this case, who continued, to their financial loss, after the 1934 changes were made by defendants in their land grant agreements, for a period *31 of approximately eight years, to make division of land grant rates on the basis that defendants had not extended their land grant equalization agreements to land grant west of the river by such changes. Other southwestern roads, who stood to profit by construing the 1934 changes in defendants' land grant agreements as extending the equalization of land grants to points west of the river, even to this day, have failed to place such an interpretation on the changes and have continued to settle and agreed to settle land grant rates on the same basis as they did prior to the 1934 changes in defendants' land grant agreements, namely on the territorial basis, that is defendants' equalizing or absorbing land grant deductions only east of the Mississippi River.
As soon as the 1934 land grant agreements were executed by the defendants and the Government, two of the plaintiffs (Missouri Pacific and St. Louis Southwestern Railroads) originated the practice, where they were the collecting carriers of the net land grant rates, of making the division on commercial divisions  at that time a unilateral division sheet of the Southwestern carriers known as the "Malcolm Percents." The result of this action was that the defendants received from the two plaintiffs a division of the revenue from the land grant shipments collected for by them, representing an absorption by the defendants of part of the land grant deductions made under land grant agreements of the two plaintiff lines for land grant mileage equalized by them west of the river. The defendants promptly protested such character of settlement, and consistently continued to protest. That one of the two plaintiffs was then in some doubt as to the correctness of its conduct is evidenced by the following excerpt from a letter the Missouri Pacific Railroad sent to the Pennsylvania Railroad on the subject in 1937:
"There appears to be a difference of opinion amongst the CFA lines as to just how much of this land grant they will equalize, and until some definite arrangements can be made between the Central Freight Association and western lines as to how this net rate should divide, our Accounting Department will continue to divide the net cash rate over route of movement on the agreed per cents via that route. Perhaps this question is of enough importance to either your line or some other CFA carrier to list the subject for joint consideration of the Division Committees of the Central Freight Association and the Western Trunk Line Committee."
No evidence appears in the record that the defendants at any time have ever made a settlement of a land grant rate in cases where they were the collecting carriers in which they assumed any land grant deductions accruing on account of land grant mileage in the southwest or plaintiffs' territory. That there was never any intention on the part of the defendants at any time, by entering into any land grant contract with the Government, to agree to absorb land grant deductions accruing on account of land grant mileage in the southwestern territory is shown by the record. Plaintiff Missouri Pacific Railroad Company concedes this fact by a letter dated March 24, 1937, addressed to the defendant Pennsylvania Railroad Company.
"Your equalization agreement with the U.S. Government, as it now stands, carries no restriction as to the extension of your equalization, and while it is possibly true that your company as well as other Central Freight Association lines did not intend to stand any of the land grant deductions west of the River, nevertheless your agreement states that you will, in connection with other carriers, protect the lowest net cash rate from point of origin to destinations." (Ex. L-4)
We can find no language in the agreement that will sustain the contention expressed in this letter. Land grant agreements are contracts between the individual carrier and the Government. They are purely voluntary and subject to such terms only as the contracting parties agree upon. Plaintiffs have no lawful right to control in any manner defendants' land grant agreements with the Government. Defendants have no lawful right to control in any manner plaintiffs' land grant agreements with the Government. They are subject to cancellation by the parties to them without interference from any other carrier. This too was conceded by the plaintiff Missouri Pacific Lines in a letter dated April 18, 1941 (Exhibit 0-4), and in a letter dated January 8, 1942 (Exhibit P-4). We quote from the latter communication:
"The signing of this agreement on the part of the Pennsylvania Railroad was purely voluntary and they are, of course, at liberty to cancel this equalization agreement whenever they see fit to do so."
*32 Both of the letters just referred to were written subsequent to the effective date of Joint Division Sheet No. 200-A (April 1, 1940), yet the author of those letters now joins plaintiffs in asserting that the defendants are without power to contract freely by making land grant agreements with the Government on such terms as the parties to the contracts may agree upon, by reason of the Joint Division Sheet No. 200-A, effective April 1, 1940. Plaintiffs' case is plagued by more than one paradox.
We are unable to find in defendants' land grant agreements of 1934, the correspondence respecting the changes that were made in 1934, or the explanation of the reason for the changes, any basis to declare that the parties to the agreement intended that the land grant rates therein contracted for should become joint rates. This Court has no power to alter the contracts between the Government and the defendants or read into them something that is not there and was not intended to be there. In interpreting the land grant agreements of defendants to provide that the defendants would absorb a portion of the land grant deductions accruing on account of land grant mileage in the southwestern territory, plaintiffs are and were in error.
In aid of their position that the equalization agreements of 1934 converted land grant rates therein provided for into joint rates, the plaintiffs direct attention to "the practices" of the defendants in determining land grant rates. Plaintiffs state the "practices" as follows:
"1. They first ascertain the lowest land grant rate from origin to destination of the shipment.
"2. They then apply that rate on such shipment moving over the equalizing or competing route from point of origin to point of destination, and thereafter collect charges based thereon.
"The practice of the defendants in so ascertaining and in so applying the land grant rates on shipments moving from point of origin to point of desination via competing or equalizing routes, as specifically authorized in their equalization agreements on file with the Government, and, thereafter collecting from the Government charges based on land grant rates so ascertained and applied, makes such land grant rates joint rates from point of origin to point of destination of the shipment to the same extent that the commercial rates, which the said land grant rates displace, are joint rates."
We are unable to reach the conclusion urged by the plaintiffs. The manner of ascertaining land grant rates is not a matter of choice with any carrier, party to a land grant agreement.
Land grant rates are determined by the destination carrier, and this carrier divides the revenue collected for the total carriage between the participating carriers. Land grant rates are not only a matter of dispute as to division, but their calculation is so intricate as to lead to frequent disputes and errors as to their calculation. These errors are frankly confessed by all parties concerned. Because the governing routes are subject to change whenever the Government can figure out a cheaper route by inclusion of more land grant mileage, it frequently happens that the net land grant rate is never in fact known until the Government makes its computations, and this may happen long after the shipment moves. Of necessity the destination or collecting carrier, on receipt of the revenue derived from a land grant shipment (competitive or controlling) must divide, allocate, or separate the total amount of revenue received into the parts due the carriers over whose line the movement passed. The War Department, by circular, specifically directs the method by which a land grant rate shall be ascertained. Under direction of the War Department in arriving at the land grant rate, the first step is to divide the through rate by the commercial division (now Joint Division Sheet No. 200-A) for the purpose of determining the amount of the through rate due the respective carriers. After this is done, on mandate of the War Department, the land grant deductions are made on account of the land grant mileage in the respective territory. Having thus arrived at the net rate after land grant deductions have been made, the respective balances or nets are lumped together in one sum and the revenue sent to the destination or collecting carrier for distribution to the carriers entitled thereto because of their part in the carriage of the Government shipment. This method of making land grant deductions in and of itself lends support to the defendants' method of making division of land grant rates on the territorial basis, or the way they are figured by Government regulation, as opposed to the plaintiffs' method of making divisions according to the commercial *33 percentage basis. This procedure, the same under all land grant agreements, evidences the fact that the terms of the land grant agreement have nothing to do with the mechanics of computing and distributing the land grant rate. The agreements may determine what land grant mileage will be equalized, but having done that, the net land grant rate is ascertained as directed by the War Department and the revenue sent to the destination carrier for distribution. The change by defendants in their land grant agreements, effective January 1, 1944, wherein they specifically declared that they would participate in land grant deductions only for land grant mileage within the Central Freight Association territory, did not change or affect the method of either ascertaining, collecting, or distributing land grant rates from what it was prior thereto.
Conceding, without deciding (because it is not necessary to a decision of this case) that Joint Division Sheet 200-A is a contract between the parties thereto for the division of "all-rail joint class and commodity rates between points in Official Classification Territory and points in Southwestern Territory," was it the purpose and understanding of the parties to that instrument that land grant rates should be considered "joint rates" as that term is used in the Division Sheet, and their division controlled by the Division Sheet?
Much of the record in this case goes to whether the division of land grant rates according to the formulae of Division Sheet 200-A would be to the advantage or convenience of plaintiffs and defendants. This is beside the point. If the parties made a contract by Division Sheet No. 200-A for the division of "all rail joint class * * * rates," and intended that land grant rates be classed as joint rates and included therein, it should be enforced, whether it is an advantageous or convenient contract for one or more of the parties, or not. On the other hand, it is not for this Court to rewrite or make a contract for the parties, regardless of how desirable settlement of their differences by that means may be.
The cause or force behind the adoption of Division Sheet No. 200-A and the manner of its formation are not controverted facts according to the record. Those facts are material on the instant question.
Prior to 1928, the eastern and western lines each made local rates to East St. Louis. (By agreement they made some joint rates.) In settlement or division by the collecting carrier, the lines received their local rates to East St. Louis. During this period, the burden of land grant rates, actual and competitive, was carried by the carriers in their respective territories, on a territorial basis, in the same manner as the defendants now make division and in this action assert division of all land grant rates should be made. In 1928, the Interstate Commerce Commission established joint rates between the eastern and western lines. On order of the Commission, the carriers substituted the joint rates, instead of the combination of locals for such traffic. Following the order of the Commission in 1928, disagreement arose between the eastern and western carriers, including plaintiffs and defendants, as to division of the joint rates prescribed by the Commission. The parties being unable to agree upon a division, in 1932 an action was commenced before the Interstate Commerce Commission (under Section 15(6) of the Interstate Commerce Act, 49 U.S.C.A. § 15 (6)) to have that body fix the percentages or divisions of the joint rates for traffic moving between points in the respective eastern and western territories. This proceeding was before the Commission for approximately eight years. Plaintiffs and defendants were parties to that proceeding. The Commission issued two orders on the subject. As a result of the first order, Joint Division Sheet 157 (Exhibit Z-3) was issued, effective September 22, 1936. Effective as of April 1, 1940, the Interstate Commerce Commission issued its final order on the division of joint rates by carriers between eastern and western territories. The Commission's final order establishing divisions of joint rates provided:
"* * * that the complainants and defendants in said proceedings, according as they participate in the transportation, be, and they are hereby, notified and required to establish on or before March 1, 1940, and thereafter apply divisions of joint all-rail interstate rates between Official Classification territory and Southwestern territory, etc. * * *"[9]
The order of the Commission had no reference to Land Grant Rates. Under the law and the record in this case, the *34 order of the Commission "that the complainants and defendants * * * are * * * required to establish * * * and apply * * * divisions of joint all-rail interstate rates between Official * * * territory, and Southwestern territory * * *" did not apply to land grant rates. First, because the Interstate Commerce Commission has no jurisdiction over land grant rates as will be later discussed more in detail, and second, the subject of land grant rates was not before the Commission in the case in which it made the order above referred to and it had no basis to make an order for the division of land grant rates.
With particular reference to the paragraph of the order above quoted, the carriers, plaintiffs and defendants to this action, with other carriers, through their authorized representatives, held conferences for the purpose of interpreting and agreeing upon the meaning and application of the order of the Interstate Commerce Commission establishing the division of joint rates. There was disagreement between them on many points. Some of their differences never were settled, but as a result of those meetings Joint Division Sheet No. 200-A was promulgated. The formation of this division sheet was desirable, if not necessary to make available to the employes of the carriers the order of the Commission as to division of rates in a practical form, rather than placing upon such employes the burden of interpreting and applying the Commission's order each time a division of rates was called for. While the Joint Division Sheet No. 200-A contains the language that it is "Issued as a result" of the Commission's orders, it was in fact issued in compliance with, and with rare exception (and then by agreement of the parties to it) in accord with the Commission's order.
The order of the Interstate Commerce Commission establishing division of joint rates is referred to in the complaint. In one of the early proceedings in this case, counsel for the plaintiffs referred to this portion of its pleadings as follows:
"It was pled as a matter of inducement, so that the Court would understand the controversy, and it might  the order of that administrative body  throw some light on the intent and the purposes of the parties when they entered into this contract."
Recognizing that it is Division Sheet No. 200-A which the plaintiffs rely upon as "this contract," for division of land grant rates between plaintiffs and defendants, we think it well to bear in mind the legal principles which govern a contract of this character 
"Whether the contract was actually signed by the receivers was quite immaterial, so long as the terms of the contract were agreed upon and understood between the parties." Girard Life Insurance Co. v. Cooper, 1896, 162 U.S. 529, loc. cit. 543, 16 S.Ct. 879, 884, 40 L.Ed. 1062.
The plaintiffs' position that Joint Division Sheet No. 200-A controls the division of land grant rates is based primarily upon the claim asserted by them that land grant rates are joint rates and therefore covered by the express terms of the contract.[10]
In their brief plaintiffs make the following assertion:
"* * * it was the purpose of all lines represented at the conferences heretofore referred to, to agree that whatever division sheet might be published, should provide for division of the revenue on all traffic of whatever kind and description, moving on joint rates between the Southwest and Official Territory.
*35 "If, therefore, Division Sheet 200-A, in conformity with the wishes and desires and intentions of all lines involved, does provide for division of the revenue on all traffic moving under joint rates between the territories involved, it follows that it must provide for division of the revenue derived from the so-called land grant traffic when that traffic moves on joint rates between such territories, when such traffic moves over equalized routes." (Page 73, Plaintiffs' brief)
Are land grant rates joint rates as that term is used in Joint Division Sheet 200-A? We understand it to be a basic rule of interpreting contracts, that where there is a dispute as to the meaning of the terms used, and the subject matter of the contract relates to a particular industry, "that meaning will be given to it which the context in which it is found, the business to which it relates, the circumstances under which it is used, show, in the light of the principal apparent purpose of the parties, that it was intended to have."[11] Cocke v. Vacuum Oil Co., 5 Cir., 1933, 63 F.2d 406, loc. cit. 407.
The interpretation placed upon the term "joint rates" by the Interstate Commerce Commission should be persuasive because of the connection between that body and the railroad industry and also that it is by its order that rail rates (not including land grant rates) are given effect in general.
The term "joint rates" as used in the Interstate Commerce Act and decisions, orders, and rules of the Interstate Commerce Commission has no reference or application to land grant rates. Section 1(4) of the Interstate Commerce Act, 49 U.S. C.A. § 1(4), provides:
"It shall be the duty of every common carrier subject to this part to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; * * *. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, * * *; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers."
If there were any doubt about what the term "joint rates" as used in the foregoing section of the Interstate Commerce Act relates to, that doubt cannot remain when the section is read in connection with Section 6(1) of the Act, 49 U.S.C.A. § 6(1).
"That every common carrier subject to the provisions of this part shall file with the commission created by this part and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. * * * The schedules printed as aforesaid by any * * *."
Land grant rates are not filed "with the Commission" and no requirement of the Act above referred to has ever been applied, nor do we understand the parties hereto are contending it should be applied to land grant rates. Section 6(3) of the Act provides:
"No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this Section, except after thirty days' notice to the Commission and to the public published as aforesaid, which * * * and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection * * *."
Neither the carriers nor the Commission have ever held that this section applies to land grant rates. The Commission is not given notice of the making of land grant equalization agreements nor their cancellation, nor changes from time to time. Nor are such changes shown by printing new *36 schedules. Section 6(4) of the Act reads as follows:
"The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the commission such evidence of concurrence therein * * *."
Land grant agreements are not joint but individual contracts between the carrier on the one hand and the Government on the other. They are not, in any case, made jointly by two or more carriers. Note Section 15(1) of the Act:
"That whenever, after full hearing, upon a complaint made as provided in section 13 of this part, or after full hearing under an order for investigation and hearing made by the commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the commission shall be of the opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this part for the transportation of persons or property, as defined in the first section of this part, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this part, is or will be unjust or unreasonable * * * the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, * * *."
The Interstate Commerce Commission has no power, and has never claimed any, to establish or regulate land grant equalization net rates.
Section 15(6) is the authority upon which the Commission made its order prescribing divisions of joint rates between the parties to this case, effective April 1, 1940.
"Whenever, after full hearing upon complaint or upon its own initiative, the commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith."
Land grant rates were not before the Commission in any particular in the Division case. This the parties agree upon. It made no order for division of land grant rates. This the parties agree upon. Further references to the Interstate Commerce Act could be made ad infinitum, but we deem it too plain for argument that the term "joint rates" as used throughout the Interstate Commerce Act has no reference to rates derived through land grant deductions and that nothing contained in the Act indicates that the term "joint rates" includes net land grant rates.
Decisions of the Interstate Commerce Commission leave no room for doubt that it neither exercises nor claims the right to exercise jurisdiction over land grant rates, and that land grant rates are not joint rates as that term is understood and used by the Commission.
In United States v. Southern Pacific Co., 25 I.C.C. 255 (1912), the Commission, in passing upon the reasonableness of reduced rates to the Government, said at page 258:
"The Commission has held that carriers, either by contract or bid or other arrangement with the War Department, may lawfully make special rates or fares for the movement of federal troops, when moved under orders and at the expense of the United States Government, and that the rates or fares so made need not be posted or filed with the Commission."
In United States of America v. Union Pacific Railroad Co., 28 I.C.C. 518 (1913) the Commission said:
"In so far as the laws administered by this Commission are concerned, the right of carriers to transport government property free or at reduced rates is elective and not mandatory. The carriers may, and *37 frequently do, avail of this right and without tariff authorization." (page 524)
The conference rulings of the Interstate Commerce Commission (while no longer in effect) are to the same effect.
Conference Ruling No. 33, issued on February 3, 1908:
"Reduced Rate Transportation for Federal State and Municipal Governments. Under Section 22 of the Act to regulate commerce, carriers may grant reduced rates for the transportation of property for the United States or for state or municipal governments, under arrangements made directly with such government and in which no contractor or other third person intervenes, without filing or posting the schedule of such rates with the Commission."
Conference Ruling No. 36, issued on February 4, 1908:
"Rates on Shipments for the Federal Government.  If title to property, such as postal cards, passes to the Government at the point of manufacture, the carrier may agree upon a rate to be applied for transporting it for the government to another point, without filing a tariff with the Commission. But if the manufacturer under his contract is required to deliver to the government at such other point, the transportation must be under the published tariff rate. In other words, if the shipment is made directly by the government, this rate may be fixed by the carrier without posting and filing the tariff, but not otherwise."
Conference Ruling No. 208(e), issued October 12, 1906:
"(e) Section 22 of the act authorizes carriers to grant free or reduced-rate transportation of property for the United States, state, or municipal governments, or for charitable purposes or for exhibitions at fairs or expositions. It also authorizes free or reduced-fare transportation of certain specified persons. This special provision and the words `reduced rates' are construed to be special authority for carriers to depart from established tariff or fares; and for such transportation as is provided for in said section 22 it is not necessary for carriers to provide tariffs or observe tariff rates or fares and regulations, etc."
Tariff Circular No. 28 of the I.C.C. defines "joint rates" as follows:
"The term `joint rate', as used herein, is construed to mean a rate that extends over the lines of two or more carriers and that is made by arrangement or agreement between such carriers and evidenced by concurrence or power of attorney.
"`Joint tariffs' are those which contain `joint rates.'"
Our attention has not been directed to any provision of the Interstate Commerce Act, or decision, order or rule of the Interstate Commerce Commission, wherein land grant rates in any manner or form have ever been referred to as joint rates, or any language used from which it would appear by the most liberal interpretation that the term joint rates as used in the Act or by the Commission included land grant rates, either actual or competitive. We believe the Interstate Commerce Act and the rulings of the Commission are subject to but one interpretation in this respect, and that is that a joint rate is a rate contained in a joint tariff by virtue of an arrangement or agreement between two or more carriers, evidenced in the manner provided by the Commission. Land grant rates, under equalization agreements, appear in no joint tariff and are not made by "arrangement or agreement" between "two or more carriers," but solely by agreement between individual carriers and the Government.
Some of the plaintiffs' witnesses testified that they considered land grant rates joint rates. We do not consider this evidence convincing. It did not show an understanding and agreement between the parties that the term "joint rate" as used in Joint Division Sheet No. 200-A was intended to include land grant rates, but rather as evidencing a conclusion of the witnesses who so testified, based on the assumption that because the collecting carrier made a division or allocation of the rates collected for land grant rate shipments for the respective lines, that such land grant rates were joint rates in the sense that they were divided and remitted by the collecting carrier. We have expressed our views on this phase of the case.
More convincing, and of probative value as to the meaning of the term "joint rates," was the testimony of Mr. Burgess. He is Chairman of the Traffic Executive Association of Eastern Territory and is a member of a committee of three set up at the request of the Government as the agency through which the carriers would speak and act in making Section 22 contracts with the Government. His testimony is convincing and no other is more detailed and *38 reasonable in explanation of the meaning of the term "joint rates."
"Because that term (joint rate) is a term of very well understood and recognized significance. I think you know that in the railroad industry that when we speak of the term joint rate, we mean something particular, we mean something that has definite earmarks, something that has a significance. It is well understood and professionally used and known in the whole railroad industry. It means the type of joint charge or rate that the Commission referred to in this Tariff Circular that has been mentioned several times here in the evidence. It means a charge that must be filed with the Interstate Commerce Commission."
"A joint rate, as I say, means, as it is well understood in the industry, a rate that is filed with the CommissionInterstate Commerce Commission, a rate that is published in a tariff which is filed; it means a rate that has to be made by an agent acting under a very definitely prescribed form of power of attorney which the Commission has set down; it means a rate that has to be concurred by all the parties to it, in a very formal and explicitly documentary manner; the forms of concurrence and forms of powers of attorney are all spelled out by the Commission; it means a rate that is open to the public; it cannot be made for one shipper only, like these Section 22 rates are. Nobody can use the Section 22 rate but the Government, and it would be a criminal offense to make a joint rate with the theory that it applied for the purpose of one shipper only. A joint rate cannot be made effective except upon thirty days' notice to the public, unless the Commission for any cause shortens that time."
Q. "You are talking about tariff regulations." A. "I am talking about joint rates as the term is known and used in railroad circles."
Mr. Wilson, Assistant Freight Traffic Manager for the plaintiff Missouri Pacific Railroad, defined a "joint rate":
"Well, a joint rate is a through single-unit rate that is applied over two or more lines under proper concurrence or agreement or practice of the two lines."
Q. "Is it a one-factor rate in dollars and cents, or one dollar, that two or more lines agree to charge, and then they divide the one dollar among themselves on an agreed amount, is that a joint rate?"
As to the term "joint land grant rate" this same witness testified:
Q. "In paragraph (e) there, I notice you used the term `joint land-grant rate.' Can you refer me to any instance where that term appears in writing, except something possibly that has been written by your counsel? A. "Why, I don't know that I could."
Q. "Did you ever see that term written until you saw it here in the brief that your counsel filed in this case? A. "Well, I would not say that I had, and would not say that I hadn't. I don't know."
Q. "Well, if you remember ever having seen it, I wish you would tell the Court where was it?" A. "I don't remember ever having seen it."
The Articles of Organization of the Southwestern Freight Bureau (of which plaintiffs are members) issued June 18, 1936 (Exhibit G-3) contains this reference to joint rates:
"No joint through rates are to be voluntarily established without agreement for divisions before publication of the rates. Members in submitting proposals should either show the basis on which they propose the joint through rates to be divided or clearly indicate that divisions are to be arranged before publication."
Land grant rates are not the result of agreements between two or more carriers.
Viewing the record in this case most favorable to the plaintiffs and giving them the benefit of every doubt, the most that can be said in support of their claim that joint division Sheet 200-A provides for the division of land grant rates is that in that respect the contract is ambiguous. If the contract is ambiguous as to the meaning of the term "joint rates" as used in the contract, we look to the intention and understanding of the parties to the contract in the use of the term "joint rates."[12] The law is plain as to the rules by which such *39 intention and understanding shall be ascertained:
In Ellis v. Harrison, 1891, 104 Mo. 270, 16 S.W. 198, the plaintiff's cause of action was founded on notes which existed in favor of the plaintiff from his son Ellis, Jr., at the time when the latter and defendant Mr. Harrison formed a partnership. The question presented was whether the notes were "mercantile debts" within the meaning of that term as used in the Articles of Partnership which bound the firm (and thereby the defendant, Harrison) for the "mercantile debts" of the then "jobbing business" of Ellis, Jr. The Court had this to say, 104 Mo. loc. cit. 279, 16 S.W. loc. cit. 200:
"The object of interpretation always is or should be to reach the actual intention of the parties. We mean, of course, that intention as expressed in the writing they employ to portray it, and consistent with the latter. When the subject-matter to which such a writing refers is not entirely definite and clear, it is permissible, and obviously just, to receive in evidence a description of the circumstances of its execution, that the court may be placed, as near as may be, in the situation of the contracting parties, with a view the better to adjudge in what sense the language used was probably intended by them. * * *
"Furthermore, the construction placed by the parties themselves upon the words `mercantile debts,' as shown by the opening entries in the books of the firm of Harrison & Ellis, was properly admissible in evidence. In case of doubt as to the significance of such a term, the contemporaneous practice of the parties to the agreement regarding it (before any controversy arises) sheds light upon their probable meaning in its use."[13] (Emphasis added.).
In Lowrey v. Hawaii, 1907, 206 U.S. 206, 27 S.Ct. 622, 626, 51 L.Ed. 1026, the Court had before it the terms "sound literature and solid science" and "inculcation of general learning and knowledge." In admitting parol evidence to ascertain the intention of the parties at the time the contract was made in the use of such terms, the Court cited Bradley v. Washington, Alexandria & Georgetown Steam Packet Co., 1839, 9 Pet. 89, 38 U.S. 89, 10 L.Ed. 72 with reference to extrinsic evidence, as follows (206 U.S. loc. cit. 221, 27 S.Ct. loc. cit. 627):
"It (extrinsic evidence) was applied in some cases to `ascertain the identity of the subject; in others its extent. In some, to ascertain the meaning of a term, where it had acquired by use a broad meaning; in others, to ascertain in what sense it was used, where it admitted of several meanings. But in all the purpose was the same. To ascertain by this medium of proof the intention of the parties, where, without the aid of such evidence, that could not be done, so as to give a just interpretation to the contract.'"[14]
What was the purpose of the carriers in meeting to formulate Division Sheet No. 200-A? What was their intention? What were they trying to accomplish in the conference out of which Division Sheet No. 200-A was born?
The written calls for those conferences and the purposes of the conferences as set out in those calls, show that the parties were called together to agree upon division of joint rates to comply with the order of the Commission in the Division Case.
Interrogatories were propounded in this case by defendants, to which plaintiffs made separate answers. The answers are voluminous and in many respects substantially *40 the same. We refer to one. Answers to interrogatories 15a to 26b present in their entirety the calls for, correspondence relating to, minutes and transcripts of the conferences at which representatives of the railroads participating, including plaintiffs and defendants, formulated, constructed and adopted Joint Division Sheet No. 200-A. A reference to these answers (Exhibit A) will reveal a striking similarity as to the purposes of the conferences as set forth in the memoranda. As to the conference held on January 25 and 26, 1940, the purpose was stated as follows: "To give consideration to various matters pertaining to the issuance of Division Sheet which will provide for percentages between Official and Southwestern territories, predicated on the decision of the Interstate Commerce Commission of July 25, 1939, in the Southwestern Division Case Docket 25,390, 25,692 et al." The conference held on February 20th, 1940, eliminated the word "predicated" and used instead the word "pursuant." The purpose of the conference of April 9 and 10, 1940, is given in the same language as the first conference. The final conference was held on May 20, 1940 
"To further consider publication of Joint Division Sheet for application between Official and Southwestern Territories, as a result of I.C.C. Docket 25,962 et al."
and contains this paragraph:
"As the differences between the representatives of the interested carriers, particularly with respect to Section B, could not be reconciled, Item 10 in its entirety is to be omitted from the joint division sheet, each group to publish its individual Item 10. The joint division sheet should merely omit Item 10 without changing the numbers assigned to the other items, for illustration, Page 4 will provide for Item 5, then Item 15, etc."
A reference to the minutes and transcript of the conferences reveals a sharp difference of opinion on many questions between the eastern and western carriers, and a detailed discussion of the subjects upon which there was a dispute. There is also manifest from these records that the discussions in the conferences were open, frank and incisive, but nowhere at no time does the subject of division of land grant rates come before the conferences directly or by inference.
The testimony of those representing the carriers, who sat in the conferences and there actually formulated, built and produced in final form Joint Division Sheet No. 200-A is enlightening. The Chairman, Laurence Oliphant, testified that the purpose of the conferences was:
"To discuss the decision of the Commission, and to determine if possible upon a joint statement of publication which would set forth in an economical and efficient manner for the benefit of the accounting departments of the involved carriers all divisions of joint through rates on file with the Interstate Commerce Commission, as prescribed by the Interstate Commerce Commission in southwestern official divisions case.
"The Commission's decision clearly prescribed how the revenues derived from joint through rates on file with the Interstate Commerce Commission, should be apportioned between the groups of all carriers involved.
"Such decision as issued could have been so employed by the accounting departments of the carriers, but to set forth specific figures, and to bring about economy, efficiency, and conservation of time, and to minimize correspondence between the representatives of the carriers, a statement that could be easily used by the representatives of all the groups of carriers affected was highly desirable."
Mr. Oliphant, who was also Vice-Chairman of the Central Freight Association, and was General Chairman of Official Territory Committee on Southern and Southwestern Divisions, testified with regard to his authority in attending the conferences at which Division Sheet No. 200-A was formulated:
"My authority was to bring about only an issue or presentation that would adhere to the Commission's decision, to present to the accounting departments specific figures that they could use in efficiently and economically setting forth the apportionment of revenues between the groups of carriers involved."
This testimony was received in support of defendants' contention that no contract for division of land grant rates was ever made, or is evidenced by Joint Division Sheet No. 200-A. Evidence of intent and purpose may not be shown to *41 vary a contract, but it may be offered to show that no contract was in fact made.[15]
We think it not without significance that in carrying out the mandate of the Interstate Commerce Commission to formulate division of joint rates in accordance with the directing principles announced by the Interstate Commerce Commission, that the parties who joined in formulating Joint Division Sheet No. 200-A were impressed with the requirement that the order of the Commission be strictly complied with. It developed in the trial of this case that there were some "five instances" in which the parties to the Joint Division Sheet deviated from the order, at least some of the parties considered it a deviation, and in each case, the deviation was a matter of discussion and agreement among the representatives of the parties plaintiffs and defendants and other roads gathered to form the Joint Division Sheet No. 200-A.
Plaintiffs, in making their case, aside from offering in evidence Division Sheet No. 200-A, did not choose to go into any matters leading up to and surrounding the formation of that instrument. On the other hand, the defendants called witness after witness, who were representatives of eastern carriers, and in three instances representatives of western carriers, who engaged in the conferences from beginning to end, in the making of Division Sheet No. 200-A. All of the witnesses, without exception or qualification, corroborated the testimony of Mr. Oliphant, and stated that they attended the conferences in which Division Sheet No. 200-A was being prepared, authorized solely to carry out the order of the Interstate Commerce Commission fixing divisions of joint rates, and that they had no authority to discuss, agree on, or execute a Division Sheet for division of land grant rates. Over objection, they were permitted to testify that in agreeing to Joint Division Sheet No. 200-A, it was not their intention or understanding that they were agreeing to a division of land grant rates. This testimony was not only uncontradicted but constituted a line of testimony which the plaintiffs' counsel did not choose to cross examine defendants' witnesses on. Not only does this line of testimony show, but aside from, and independent of it, we believe it conclusively shown by other evidence we will presently refer to, that at the time the parties formulated Joint Division Sheet No. 200-A, they had but one purpose in mind, and only one purpose, namely to carry out the directions of the Interstate Commerce Commission issued in the case, establishing division of joint rates. There is no evidence that any of the parties to Joint Division Sheet No. 200-A intended or understood they were agreeing to a division of "land grant rates."
What were the practices and acts of the parties, as to division of joint land grant rates, contemporaneous with and following the birth of Joint Division Sheet No. 200-A.
"There is no surer way to find out what parties meant, than to see what they have done." Brooklyn Insurance Co. v. Dutcher, 95 U.S. 269, loc. cit. 273, 24 L.Ed. 410.
"The plaintiffs have scrupulously observed it and have applied the agreed percentages therein contained to all joint rates, including joint land grant rates." Pages 17 and 18, Plaintiffs' Brief.
Have the plaintiffs "scrupulously" observed the contract? Although the plaintiffs now assert without qualification that Joint Division Sheet No. 200-A constituted a contract governing the division of land grant rates, yet no party to that contract declared such to be its effect until over three years had passed after its issuance. No one a party to the Division Sheet changed its course of action with respect to division of land grant rates based upon the effective date of Division Sheet No. 200-A. Two of the plaintiffs (Missouri *42 Pacific Railroad Company and St. Louis Southwestern Ry. Co.) made divisions where they were the collecting carrier after effective dates of Division Sheet No. 200-A the same as prior to Division Sheet No. 200-A going into effect, and justified their action, not on the Division Sheet, but on the land grant agreement of the defendants. The remaining plaintiff (St. Louis-San Francisco Railway Company) at the time Division Sheet No. 200-A went into effect was dividing land grant rates on a territorial basis (as defendants contend the division should be made) and made no change in its method of division until over a year had elapsed after Division Sheet No. 200-A took effect, and like the other plaintiffs, did not then seek to justify its acts on the Joint Division Sheet but on the terms of defendants' land grant agreements (See Exhibit H). This plaintiff is faced with the dilemma: if Joint Division Sheet No. 200-A is a contract providing for the division of land grant rates, then why did this plaintiff fail to comply with it? Why did all plaintiffs fail to demand that defendants comply with it until September 24, 1943 (Exhibit I), years after its execution? On the other hand, the defendants have continuously contended for a division of land grant rates on a territorial basis, without respect to the hearings or orders in the cases before the Interstate Commerce Commission and the promulgation and effective date of Division Sheet No. 200-A.
If land grant rates are joint rates as used in Joint Division Sheet No. 200-A, and if it was the intention and understanding of the parties, or either party, that Joint Division Sheet No. 200-A should control the division of land grant rates, there is no question in this Court's mind but that promptly on promulgation of Joint Division Sheet No. 200-A, the plaintiffs would have so represented to the defendants, demanded divisions of land grant rates in accord with it, and if defendants had failed to meet their demands, have pitched battle upon that ground immediately and stood steadfast on the agreement which they now allege they made in Joint Division Sheet No. 200-A with respect to land grant rates  because plaintiffs, by their conduct were paying large sums of money to the defendants, which, on the basis of their present claim, was the property of the plaintiffs. Although division of land grant rates had been a subject of dispute between the eastern and western lines, plaintiffs and defendants for many years, and was still a matter of controversy when Joint Division Sheet Number 200-A was being formulated, and both plaintiffs and defendants had representatives at the conference at which the Division Sheet was formulated, the subject of land grant rates and their division was not discussed in any manner, shape or form, by the representatives of plaintiffs' and defendants' roads during the conferences, and yet plaintiffs contend it was the purpose of all parties that Joint Division Sheet No. 200-A should settle the controversy of division of land grant rates.
The Commission's order on division of joint rates was in two installments; the first order was issued in 1936, effective in September, 1936. Following this, the railroads affected, including plaintiffs and defendants, met in conference, with the result that Joint Division Sheet No. 157 was issued. The second order was effective in April, 1940, and in response to it Joint Division Sheet No. 200-A was issued. Both orders contain language that the divisions are to be of all joint class and commodity rates. Insofar as language which plaintiffs now rely on as constituting an agreement for the division of land grant rates is concerned, the exact language appears in Joint Division Sheet No. 157 as in No. 200-A. The dispute between plaintiffs and defendants as to division of land grant rates was in existence prior to the adoption of Division Sheet No. 157, yet no claim was made following its adoption, or is now made, that Joint Division Sheet No. 157 constituted a contract controlling the division of land grant rates.[16] The language and terms in Joint Division Sheet No. 157 did not settle the controversy between plaintiffs and defendants as to division of land grant rates, and with the controversy still raging, plaintiffs met representatives of the defendants for the formation of Joint Division Sheet No. 200-A, four years later, and the subject of settlement of division of land grant rates never having *43 been broached or laid on the table for discussion by the plaintiffs or defendants, in any way during those conferences, plaintiffs now ask the Court to hold that the same language as used in Division Sheet 157, appearing again, under identical circumstances, in Joint Division Sheet No. 200-A, did settle the controversy as to division of land grant rates.
When plaintiffs' witness, Mr. Feldman, was pressed for an answer on this phase of the case, the following proceeding took place:
Q. "Are you willing to say why it was that in making up Division Sheet No. 200-A, you believed that the use of the words `joint class and commodity rates' would constitute an agreement between your road and the Eastern Roads, or the defendant roads, when you have conceded that three years before you used that same language on the division sheet, and the controversy had not been cleared up and it was evident to you that an agreement had not been embodied in those words?"
Mr. Larimore: "The objection is, he states a controversy to which the Eastern Roads and the Southwestern Roads were parties. They both knew the controversy existed, and each had a right to clear it up. Now, he asked this witness why he did not clear it up. The obligation was on all the parties, and the question is improper as to this witness."
The Witness: "* * * I was going to say that the Eastern Lines had been just as lax as the Western Lines had been."
We think this is not without some bearing on the issue whether Joint Division Sheet No. 200-A is a contract or not a contract for division of land grant rates. We are in agreement with counsel for the plaintiff that both roads knew the controversy with regard to land grant rates existed; that each had a right to clear it up; and there may be justification for the charge that one group of lines was "just as lax" as the other in settling the controversy; but a "duty" to make a contract, an obligation to "clear up" the controversy, a "right to clear it up," an obligation on "all the parties" to clear up the controversy, or a "lax" attitude upon the part of the parties in clearing it up, are not the elements of a contract, either individually or collectively. The testimony and remarks of counsel quoted show that a real controversy then existed as to division of land grant rates, was recognized by all the parties to the case, and if the parties intended to and were settling this controversy in the negotiations preceding, during, and resulting in Joint Division Sheet No. 200-A, then somewhere, sometime, somebody representing either plaintiffs or defendants would at least have dared mention the subject. No one has asserted in this case up to this time, and we confidently believe that no such claim will be made hereafter, that any one of the "five deviations" from the order of the Interstate Commerce Commission ranked in importance, as a matter calling for settlement by the plaintiffs and defendants, with that of the controversy regarding division of land grant rates, yet in the settlement of the "five deviations," each in its turn was brought out before the conference which agreed on Joint Division Sheet No. 200-A, and a special agreement made with regard to it. Yet this court is asked to hold that a matter of such grave importance and long standing conflict between the parties plaintiff and defendant as a division of land grant rates was at the same time settled without a word being uttered on the subject.
As we view the record in this case, failure of plaintiffs or defendants to settle the controversy over division of land grant rates was not due to "laxity" on the part of either. That situation is the result of a deep seated and steadfast position taken by the eastern roads, including defendants, as to how division of land grant rates should be made, and the failure or refusal of some of the western roads, including plaintiffs, to reconcile themselves to a continued recognition of that position, due perhaps, in part because of the large revenues in recent years, resulting from increased Government traffic. The issue is as fundamental between the parties (if not in size) as the division of joint rates, litigated for eight years before the Interstate Commerce Commission. With the promulgation of the Interstate Commerce Commission of joint rates, there arose an issue between the eastern and western lines of division of those joint rates. That controversy was finally settled by Joint Division Sheet No. 200-A, effective April 1, 1940. Commencing in 1934, there arose a controversy between the eastern and some of the western lines over division of land grant rates, about which only the parties, and not the Interstate Commerce Commission, *44 were concerned. A comment of the Supreme Court in the case of First National Bank v. Hall, 101 U.S. 43, loc. cit. 49, 25 L.Ed. 822, is illustrative of the position of the parties with reference to these two controversies:
"The minds of the parties, as shown by these letters, moved on parallel, not on concentric lines. There was not the meeting of minds and the mutuality of assent to the same thing, which are necessary to create a contract."
As early as 1937 (See Exhibit L-4) one of the plaintiffs suggested that the question as to how much land grant would be equalized by the eastern and western carriers was of sufficient importance "to list the subject for joint consideration" of the committees of the Freight Association of the Central and Western Trunk Line carriers. This was done. It was not listed "for joint consideration" at the conferences where the Division Sheet was formulated, but immediately on disposal of the latter subject it was listed for the "joint consideration" of the plaintiffs and defendants and other carriers.
The conferences on formulation of Joint Division Sheet No. 200-A concluded in May, 1940, and within ten days of the time when "final understanding" was reached, the representatives of the plaintiffs and defendants were starting in another series of conferences on the subject of land grant rates, equally open, frank and incisive as had been those leading to the issuance of the Joint Division Sheet.
Unless part of the western lines and the plaintiffs are to be convicted of bad faith in their negotiations with the eastern lines, we believe Defendants' Exhibits I-2 and E-3 show that as late as September 14, 1943, neither the eastern lines nor western lines, including plaintiffs and defendants were aware, to say nothing of a claim, of settlement of the question of division of land grant rates by virtue of formulation and publication of Joint Division Sheet No. 200-A. Defendants' Exhibit I-2 is a communication from the Chairman of the Central Traffic Executive Committee (of which defendants are members) representing the eastern roads, to the Chairman of the Southwestern Freight Bureau (of which plaintiffs are members) representing the western roads, both of whom had attended in their respective capacities, the conferences that agreed on Joint Division Sheet 200-A. The letter called attention to the dispute between the eastern and western lines over division of "land grant allowances" and submitted a definite proposition for settlement of the dispute. This communication is dated May 29, 1940. The final conference on issuing Division Sheet 200-A was held on May 20, 1940. The proceedings leading up to the adoption of Division Sheet No. 200-A must have been fresh in the minds of all parties concerned with its formulation at this time. The Chairman of the Southwestern Freight Bureau, on June 13, 1940, wrote to the Chairman of the Central Freight Association (Exhibit K-2) and, referring to the subject of division "of Government freight between Official and Western classification territory" advised "this subject will be listed for consideration at the August meeting of our Division Committee." There is no claim here that Division Sheet No. 200-A had settled the controversy over division of land grant rates. On August 10, 1940, the Chairman of the Southwestern Freight Bureau informed the Chairman of the Central Freight Association Bureau (Exhibit M-2) that the subject of division of land grant rates was listed for consideration at the August meeting "of our Division's Committee * * * and postponed to our next meeting commencing October 1, affording our lines an opportunity to develop further information on the subject." Still no declaration from representatives of the plaintiffs that Division Sheet No. 200-A had settled the controversy. At the time the Chairman of the Central Freight Association Bureau communicated with the Chairman of the Southwestern Freight Bureau, submitting a proposal for settlement of land grant revenue divisions, a like communication was sent to western trunk lines. The Western Trunk Line Committee, on August 6, 1940 (Exhibit N-2) rejected the proposal of the Central Traffic Executive Committee, not on the ground that Division Sheet No. 200-A had settled the matter of division of land grant rates, but "because the proposal of the Central Freight Association Executive Committee would not be feasible because it would result in a confliction of the various equalization agreements on file with the Government." On October 5, the Chairman of the Southwestern Freight Bureau sent a communication (Exhibit N-2b) in which he expressed concurrence in the action taken by the Western Trunk Line Committee "thus declining proposal as submitted by Official lines." However, the *45 Southwestern Freight Bureau reconsidered their rejection of the proposal of the eastern lines, and on October 21, 1940 (Exhibit O-2) sent the Central Freight Association Bureau a letter to the following effect, "For your information, wish to advise that this subject (divisions of land grant rates between Western and Official territories) has been listed for further consideration at the December meeting of our Division Committee on request of a member line, and you will be advised further disposition which may be made of the subject at the conclusion of that meeting." On January 13, 1941, the Chairman of the Central Freight Association Bureau advised the Chairman of the Southwestern Freight Bureau (Exhibit P-2) of their dissatisfaction with rejection of the proposal and stated that they desired a conference to work out a plan "that will be agreeable to all concerned," for division of land grant rates. On January 27, 1941, the Chairman of the Southwestern Freight Bureau informed (Exhibit Q-2) the Chairman of the Central Freight Bureau that the subject of Division of land grant rates, listed for consideration at the December Committee meeting was postponed to the February meeting. This letter also expressed agreement to meeting the representatives of the eastern lines in conference on the subject of division of land grant rates. The conference was held in Chicago on June 27, 1941, for the purpose of determining a basis for dividing revenue on U. S. Government freight, subject to land grant deduction, between Western classification territory and Official classification territory. Representatives of the plaintiffs and defendants attended that conference. Exhibit R-2 is a copy of minutes of the conference. The minutes contain this entry:
"After a full discussion of this subject, it became evident that no definite agreement could be reached at the instant Conference and that further, insofar as traffic between Official Classification territory and Western Trunk Line Territory was concerned, no final record could be made until the situation involved in Subject No. 1 was disposed of."[17]
The eastern lines, through their representatives at the conference, again submitted a basis for dividing land grant revenues. The conference adjourned "with the understanding that the subject involved would be given further consideration." Still no reference of any character in any of these proceedings and communications to a claim on the part of any one that Division Sheet No. 200-A had settled the subject, i.e., division of land grant rates.
The conference of June 27, 1941, having failed to settle the land grant rate division controversy between "Central Freight Association lines" and "Southwestern Freight Bureau lines," on October 4, 1941, the Central Freight Association lines, through their Chairman, again broached the subject to the Southwestern Freight Bureau lines, and submitted a proposition similar to that which had been submitted by their letter of May 29, 1940 (See Exhibit S-2). The Southwestern Freight Bureau on December 12, 1941, replied to the new approach with a letter (Exhibit T-2) containing the following paragraphs:
"Referring further to your letter of November 4, file A-180-51-1 and to our letter of November 13 in the matter of equalization of Land Grant Allowances on Government freight moving between Official and Western Classification territory.
"Definite conclusions were not reached on this subject by our Executive Committee at their meeting this week and the subject was postponed for further consideration at their next meeting to be held commencing January 7, 1942."
On February 16, 1942, the Southwestern Freight Bureau notified Central Freight Association (Exhibit V-2) as follows:
"The subject is still pending before our Executive Committee and is listed for consideration at the March 4 meeting. After it has been disposed of we shall be pleased to advise you."
On March 10, 1942, the Central Freight Association by letter (Exhibit W-2) pressed the Southwestern Freight Bureau for advice as to the action taken at the "Executive Committee meeting of March 4th." On April 14, 1942, the Southwestern Freight Bureau advised the Central Freight Association of the action of the meeting of their Executive Committee, which action was:
"This subject was postponed at our March meeting with request that you advise as to the details of what is contemplated *46 under the CFA proposal, pending receipt of which our lines have not expressed any views on the subject.
Not only was there no claim, now two years after effective date of the division sheet, that it had settled the dispute on that subject, but here we find the representative of all the plaintiffs informing defendants, "* * * our lines have not expressed any views on the subject."
On April 23, 1942, the Central Freight Association replied to the letter of the Southwestern Freight Bureau of April 14, 1942, explaining in detail their proposal for settlement of the land grant rate division dispute (Exhibit Y-2). On receipt of this explanation, the Southwestern Freight Bureau, on June 8 (Exhibit Z-2) advised the Central Freight Association of their rejection of the proposal for settlement, stating the reason for the rejection  not that the controversy had been settled by Division Sheet 200-A  but that the proposal was "contrary to the principles of the land grant equalization agreement." To this letter the Central Freight Association replied on June 13, 1942 (Exhibit A-3) asking the Southwestern Freight Bureau to explain their position that the land grant equalization agreement justified the rejection of the proposal of the Central Freight Association for a settlement of the land grant rate division controversy. In reply to this request, the Southwestern Freight Bureau on June 16, 1942 (Exhibit B-3) sent a letter to the Central Freight Association, explaining their position as follows:
". . . All of the railroads which are parties to the land-grant equalization agreement have therein indicated their agreement to equalize with each other the rates applying over the railroads having land-grants. By that agreement the Eastern Lines have definitely committed themselves to join their Western connections in this equalization. The purpose of the record of your Executive Committee is to retract from the land-grant equalization agreement. The Southwestern Lines are unwilling to concur in your record. They feel that the land-grant equalization agreement is binding and that the Eastern Lines are obligated thereby to participate with all other lines parties to the agreement in the equalization of the land-grant deductions, so long as the agreement is in effect. * * *"
It appears that a conference took place between the Southwestern Freight Bureau and the Central Freight Association. There followed a letter written by the Central Freight Association on June 16, 1942, on the subject of settlement of the land grant rate division controversy, and on August 13, the Southwestern Freight Bureau again wrote the Central Freight Association lines (Exhibit C-3) that after having given consideration to the proposal submitted in the conference, it was declined. The efforts of the eastern lines to effect a settlement of the controversy with the Southwestern lines appears from these exhibits to have reached its climax on September 14, 1943 (See Exhibit E-3), when a meeting was held in Chicago of all the railroads, the "Eastern, Western and Southern Lines," "to consider the effort of certain Southwestern lines to force upon the Central Freight Association lines an interpretation of the land grant equalization agreements of those lines contrary to their intent and to the long existing practice, in such manner as to impose upon the Central Freight Association lines a portion of the land grant deductions arising from land grant mileage in Southwestern territory." At this meeting the plaintiff, St. Louis-San Francisco Railway Company was represented by the same counsel that represented it at the trial of this case  a gentleman of learning, long experience, and of proven outstanding ability in litigation of the character involved in this case. We assume he was well informed  he always is  on all phases of the matter before the conference. Before the conference, according to its minutes, this counsel expressed his opinion, not that the equalization agreements controlled the division of land grant rates, not that Division Sheet 200-A settled the controversy, but that under the order of the Interstate Commerce Commission in the Official Southwestern Division case, "the carriers must divide land grant rates on the divisional basis prescribed by the Commission in that proceeding."[18] No such claim was urged before this Court in this case. The result of this conference was that the Chairman of the Southwestern Freight Bureau states "that the Southwestern lines had not fully considered this matter (division of land grant rates between eastern and western carriers) and would deal with it at a later meeting." All *47 the lines represented at this conference except "certain of the Southwestern lines" "represented by Chairman Knobeloch" approved a statement of principle as follows:
"It is the sense of this meeting that in principle the several equalization agreements between the respective railroads and the Government of the United States are intended to provide for the absorption by the lines in each territory only of the land grant disability arising from land grant mileage in that territory, and that in every instance the application of the agreements should be in harmony with that principle."
The conference of September 14, 1943, was over three years after the effective date of Division Sheet No. 200-A and to that date the record in this case is silent of any one on behalf of any road making a claim that Division Sheet No. 200-A constituted a written contract between the eastern and western roads for the settlement of the controversy as to division of land grant rates. Ten days after the conference had adjourned counsel for the plaintiff lines, for the first time declared that the subject of land grant rates had been settled by a contract "Effective April 1, 1940," Joint Division Sheet 200-A.[19] Is this Court to understand that such an agreement was in existence and yet during all of this period it lay hidden behind the veil of silence and that the extended correspondence and conference after conference between May 29, 1940, and September 14, 1943, was on a subject that had been settled by a binding contract? To so hold would be to declare a contract in existence that apparently was not recognized by any of the parties to it for a period of years after its execution. It is no answer to the correspondence and conferences evidenced by Defendants' Exhibits I-2 to E-3 for plaintiffs to say (as their counsel did during oral argument) that the parties to the correspondence and conferences were traffic men and "would meet any time for any purpose." (The Court was impressed by those who testified, that they were men of outstanding ability and seriously concerned about their work.) The correspondence and conferences which have been recited in detail were being carried on in the same manner by representatives, and in many cases by the identical personnel, as had formulated Division Sheet No. 200-A. There is no claim in this case which has come to the Court's knowledge of a denial of authority to represent either the plaintiffs on the one hand or the defendants on the other in this correspondence and conferences just alluded to. This line of evidence sustains the defendants' position in this case, that no agreement was ever made with plaintiff for a division of land grant rates.
To summarize, we find that plaintiffs and defendants were at the times referred to in dispute on two subjects: division of "joint rates" and "division of land grant rates." Never did the two meet in joint settlement or settlement otherwise. The former was settled by order of the Interstate Commerce Commission and agreement of the parties; the latter was not. Plaintiffs have at various times claimed that land grant rates should be settled according to commercial percentages for various reasons. Defendants were presented with the claim by some of the plaintiffs that settlement had been made by the defendants' 1934 land grant agreements; then followed a claim that the order of the Interstate Commerce Commission *48 had settled the question. Unable to settle the dispute by negotiation, defendants served notice in the fall of 1943 that they would cancel their 1934 land grant agreements and submit new land grant agreements worded as to leave no question, that they would only equalize land grant mileage in Central or Official Freight Association territory, as they had previously been invited to do by one of the plaintiffs. Whereupon, defendants were informed that in April, 1940, they had made a contract (Joint Division Sheet 200-A) by which they were not only bound to divide land grant rates by the percentages set out in the contract, but that by the contract they had estopped themselves to change their land grant agreements. On this last position, which plaintiffs claim is aided by defendants' 1934 land grant agreements, plaintiffs elected to institute this action.
There is another line of exhibits, not without a bearing in this case. Joint Division Sheet No. 200-A uses the language that it is a division sheet "showing percentages for dividing all rail joint class and commodity rates between points in Official Classification territory and points in Southwestern territory." Exhibits V to C-1 are division sheets issued by the Southwestern lines "showing basis for dividing through rates" applying between points on the Southwestern lines. On the face of these Division Sheets appears this statement, "the percentages between given points are guaranteed to apply, with the exceptions shown, only via lines on which said points are situated, or via routes composed of two or more of the lines parties hereto, which may have agreed arrangements for joint through rates and continuous carriage of freight." As we understand plaintiffs' position, it is that the use of the term "joint" rates, in Division Sheet No. 200-A includes land grant rates, without any further identification being necessary in the Division Sheet, yet when the Southwestern lines, of which plaintiffs are parties, prepared Division Sheets for use of the Southwestern lines, and used like terms in each of the exhibits referred to they inserted the words, "In the division of net rates on Government freight to and from all points in Southwestern Tariff Committee Territory, commercial per cents will be used." Had plaintiffs insisted on including a similar provision in either Joint Division Sheet 157 or 200-A, and stood on that position, we doubt if either would ever have been issued, or that they would have been supported by all Southwestern lines in their stand.
We also observe that while the plaintiffs strenuously assert that they do not seek any division on percentage basis set out in the division sheets of revenues for transportation over land grant mileage, but only as to movements over competing routes, yet frequently the competing route of plaintiffs contains land grant mileage, and is only saved from being a governing route by reason of carriage beyond the gateways, over defendants' competing routes. Illustrations of this kind are shown in Plaintiffs' Exhibit 13, one from Newberg, Missouri, to New York. Over this land grant mileage the carrier was bound to carry the Government freight at the reduced rate. Under division of land grant rates by plaintiffs' method, it is enabled to pass over to the defendant lines part of that compulsory land grant deduction, although plaintiffs disclaim the right or intention of doing so.
For the reasons set out, we find that plaintiffs have failed to sustain the burden of proof the law casts upon them, on either of the positions advanced by them as a basis for the relief prayed for.
"A contract is a deliberate agreement between competent parties to do or to abstain from doing some act."[20]
"A contract is the agreement which the parties made and not the writing which evidences the agreement."[21]
To constitute a contract  "there must be a meeting of the minds of the parties; they must assent to the same thing in the same sense."[22]
Judged by these fundamental and elementary principles, Joint Division Sheet No. 200-A is not a contract or agreement governing division of land grant rates. The parties to that instrument, and the parties to this action, never did, by formation, issuing, or agreeing to its terms, execute a contract providing the method and manner of dividing land grant rates on Government shipments.
*49 Plaintiffs and defendants join in requesting that the existing controversy be terminated by a declaratory judgment.[23] Plaintiffs pray for further relief in the nature of an injunction against the defendants, restraining them from dividing land grant rates, "other than as provided" in Joint Division Sheet 200-A. Defendants ask for an injunction restraining the plaintiffs " that in making settlement with defendants, plaintiffs shall not deduct from the sums payable to defendants any land grant deductions other than those specifically assumed" by defendants in the respective equalization agreements. Such additional relief this Court has jurisdiction to grant in an action the primary purpose of which is a declaratory judgment.[24]
For the reasons herein stated, the plaintiffs are without legal justification in cases where they are the collecting carriers for deducting from the revenue due the defendants any land grant deductions other than those assumed by the defendants in their respective equalization agreements with the Government, and defendants are entitled, in addition to a declaratory judgment, to injunctive relief against the plaintiffs, that no such deductions from the revenue due them shall be made by the plaintiffs.
Decree will go accordingly.
NOTES
[1] And "that in the interest of all of the parties a declaratory judgment should be entered herein settling this controversy." (P. 12, Answer)
[2] Official Territory may be designated roughly as that part of the country east of the Mississippi River and north of the Ohio River and a line following the Norfolk & Western Railway from Portsmouth, Ohio, to Norfolk, Va. It is sub-divided into three rate territories which may be roughly delimited as follows: Central, which extends east to Buffalo, N. Y., Pittsburgh, Pa. and Huntington, W. Va.; Eastern Trunk Line, which extends east from Central Territory to the Hudson River; and New England, which includes the New England states. Southwestern Territory includes approximately the southern portion of the State of Missouri, all of Arkansas, Oklahoma and Texas, and that portion of Louisiana which is west of the Mississippi River.
[3] This difference as to division of land grant rates is not confined to the parties to this cause, but other railroads similarly situated are engaged in like controversy; some are engaged in litigation in other jurisdictions on the same subject.
[4] 10 U.S.C.A. § 1375  "Charges for transportation by land-grant railroads subject to regulation by Congress. Payment shall be made at such rates as the Secretary of War shall deem just and reasonable and shall not exceed 50 per centum of the full amount of compensation, computed on the basis of the tariff or lower special rates for like transportation performed for the public at large, for the transportation of property or troops of the United States over any railroad which under land-grant acts was aided in its construction by a grant of land on condition that said railroad shall be and remain a public highway for the use of the United States, and for which adjustment of compensation is required in accordance with decisions of the Supreme Court construing such land-grant acts, or over any railroad which was aided in its construction by a grant of land on condition that such railroad should be a post route and military road, subject to such regulations as Congress may impose restricting the charge for such Government transportation, and such payment shall be accepted as in full for all demands for such service."
[5] "But the land grant, made many years ago, in aid of the railroad enterprise was not a mere gift or gratuity. See Burke v. Southern Pacific R. Co., 234 U.S. 669, 679, 34 S.Ct. 907, 58 L.Ed. 1527. The carrier's obligation to haul property of the United States at reduced rates was a part of the consideration for which the land grant was made. Part of appellant's compensation for hauling the coal was paid in land, and the balance was paid in money. It cannot be said that the total was less than a dollar per ton." Louisville & Nashville R. Co. v. United States, 1925, 267 U. S. 395, 45 S.Ct. 233, 236, 69 L.Ed. 678.
[6] "By what is known as the equalization agreement, railroad carriers, including respondent and its connections, severally agreed with the government to accept for transportation, where the government is entitled to reduce rates on lines so aided, the lowest rates available as derived through deductions on account of land grants from the regular tariff rates." United States v. Galveston, etc., R. Co., 1929, 279 U.S. 401, 403, 49 S.Ct. 362, 73 L.Ed. 760.
[7] "Where joint traffic is involved, the net rates or fares will be determined by dividing the through rates or fares between individual carriers comprising the route according to commercial division bases and applying to the separate proportions accruing to land-grant railroads percentages published herein." War Department Circular 5-A.
[8] Actually no movement is on a basis of these exact figures and there are some movements where the greater per cent of land grant mileage, on which the rate is based, will be found east of the Mississippi River.
[9] By supplemental order, the effective date was changed to April 1, 1940.
[10] Showing percentages for dividing "All-Rail Joint Class and Commodity Rates between Points in Official Classification Territory and Points in Southwestern Territory via Gateways named below: Cairo, Ill.; East St. Louis, Ill.; Flinton, Ill.; Gale, Ill.; Kellogg, Ill.; Metropolis, Ill.; St. Louis, Mo.; and Thebes, Ill."

"The divisions provided herein apply via all the carriers named in the tariffs lawfully on file with the Interstate Commerce Commission as the participating carriers in the joint rates applicable between stations named in Section 1, on the one hand, and stations named in Section 2 on the other, including the carriers specifically named on pages 2 to 4 of this Division Sheet.
"The divisions provided herein apply in connection with all-rail joint class or commodity rates between stations named in Section 1, on the one hand, and stations named in Section 2, on the other, (including):
"(a) Joint rates constructed on basis of aggregate of intermediate rates (combination rates) under combination rules, for example: Item 1805 of S.W.L. Tariff 152-E, and Item 80, S.W.L. Tariff 252.
"(b) Rates applicable on Export or Import Traffic."
(From Joint Division Sheet 200-A)
[11] See also Corbett v. Winston Elkhorn Coal Co., 6 Cir., 1924, 296 F. 577; City of High Point v. Duke Power Co., D.C. M.D., N.C., 1940, 34 F.Supp. 339, affirmed in 4 Cir., 1941, 120 F.2d 866; Glens Falls Indemnity Co. v. Apple & Bond Co., 4 Cir., 1934, 69 F.2d 695; Heyworth v. Miller Grain & Elevator Co., 1903, 174 Mo. 171, 73 S.W. 498; Robinson v. United States, 1871, 13 Wall. 363, 80 U.S. 363, 20 L.Ed. 653; Restatement of Contracts (1932) Sec. 235(b).
[12] "The contract was, therefore, ambiguous, and the court did not err in receiving evidence to determine the intent of the parties. A contract is ambiguous when it is susceptible of two different meanings. 17 C.J.S., Contracts, § 294. The sole object of construction is to arrive at the intention of the parties. S. S. Kresge Co. v. Sears, 1 Cir., 87 F.2d 135, 138 [110 A.L.R. 583.] When a contract is found to be ambiguous evidence of extrinsic circumstances may be received to show that the parties themselves have adopted a permissible method of applying its terms to the subject matter. Wilmot v. Minneapolis Automobile Ass'n., 169 Minn. 140, 210 N.W. 861." Zehnder, Trustee, etc. v. Michaud, 8 Cir., 145 F. 2d 713, 714.
[13] See also Canal Co. v. Hill, 1872, 15 Wall 94, 82 U.S. 94, 21 L.Ed. 64; Laclede Const. Co. v. T. J. Moss Tie Co., 1904, 185 Mo. 25, 84 S.W. 76; Nat'l Bank of Commerce v. Flanagan Mills & Elevator Co., 1916, 268 Mo. 547, 188 S.W. 117; Interior Linseed Co. v. Becker Moore Paint Co., 1918, 273 Mo. 433, 202 S.W. 566; Haseltine v. Farmers' Mut. Fire Ins. Co., 1924, Mo.Sup., 263 S.W. 810, not reported in State Reports; 3 Williston, Contracts (1936) 1780, Sec. 618; 13 C.J., Contracts, 521; 17 C.J.S., Contracts, § 295; 22 C.J., Evidence, 1173, 1182, 1183, 1186; 32 C. J.S., Evidence, §§ 959, 960; Restatement of Contracts (1932) Sec. 235(d).
[14] See also Standard Scale & Supply Co. v. Reiter, 7 Cir., 1912, 199 F. 91; Ryan v. Ohmer, 2 Cir., 1917, 244 F. 31; Neal v. Akers, 4 Cir., 1923, 286 F. 903; Walter v. Rowlands, 9 Cir., 1928, 28 F.2d 687; Deutschle v. Wilson, 8 Cir., 1930, 39 F.2d 406; Interior Linseed Co. v. Becker-Moore Paint Co., 1918, 273 Mo. 433, 202 S.W. 566; National Bank v. Flanagan Mills & Elevator Co., 1916, 268 Mo. 547, 188 S.W. 117.
[15] "The question of whether or not a contract was made is to be solved by ascertaining the mutual intention of the parties." H. C. Lindsly & Son v. Kansas City Viaduct & Terminal Co., 152 Mo. App. 221, 133 S.W. 389. See also Central Bitulithic Paving Company v. Village of Highland Park, 1910, 164 Mich. 223, 129 N.W. 46 at p. 48, Ann.Cas.1912B, 719; Bennett v. Northwestern National Insurance Company, 1927, 84 Cal.App. 130, 257 P.586 at page 588; Netherlands American Steamship Navigation Co. v. Wagner, 2 Cir., 1926, 12 F.2d 640 at page 641, certiorari denied 273 U.S. 725, 47 S.Ct. 237, 71 L.Ed. 860; National Bank of Kentucky v. Louisville Trust Co., 6 Cir., 1933, 67 F. 2d 97, certiorari denied 291 U.S. 665, 54 S.Ct. 440, 78 L.Ed. 1056; Wrede v. City of David City, 288 N.W. 542 (Neb.1939) at p. 544.
[16] "Joint Division Sheet 200-A is the sole existing agreement between the parties hereto as to the divisions of joint rates between these two territories, and it provides on its title page that all divisions in effect prior to April 1, 1940, are thereby cancelled." Plaintiff's Brief, page 17.
[17] Subject No. 1 related to the method followed by the Government Accounting Office in arriving at land grant deductions, and not the subject of division of land grant revenue.
[18] Taken from memorandum of conference. Defendants' Exhibit E-3.
[19] "It is hardly necessary for me to say to you two gentlemen that Division Sheet No. 200-A constitutes a written contract within the meaning of the law between the Official and the Southwestern carriers. * * * This Division Sheet No. 200-A constitutes the sole written contract, through St. Louis and southern gateways, between the Eastern and the Southwestern lines as to the divisions of all joint rates, the division sheets in effect prior thereto having been cancelled by agreement, and it contains no exceptions. It applies to all joint rates, whether published under Section 6 of the Act or agreed to or established under Section 22 of the Act, and as to all joint rates agreed to under Section 22 (reduced rates for the Government other than land grant rates), the Eastern lines are dividing those rates in conformity with Division Sheet No. 200-A.

* * * * * *
"If Division Sheet No. 200-A, which now constitutes the sole written agreement as to divisions between us, is not applicable to land grant rates as your respective accounting departments contend, there is, therefore, in our opinion, no agreement between us as to the divisions of such rates. Absent a joint agreement, a carrier in the one territory cannot recover from a carrier in the other territory as to past shipments what it deems to be due it. I cannot conceive that when we entered into the written agreement as to the divisions of all joint rates it was intended by the parties that some joint rates, whether established under Section 22 or otherwise, should be excluded from that agreement." (Defendants' Exhibit I)
[20] Federal Surety Co. v. Pitts, 119 Tex. 330, 29 S.W.2d 1046.
[21] Edwards v. School Dist., 221 Mo.App. 47, 297 S.W. 1001.
[22] Luckey v. St. Louis & S. F. R. Co., 133 Mo.App. 589, 113 S.W. 703.
[23] "It is also clear that a declaratory judgment will serve a useful purpose in clarifying and settling the legal relations of the parties to this action and will terminate and afford relief from uncertainty and controversy." Plaintiffs' brief, page 10.
[24] Federal Uniform Declaratory Judgments Act, Jud.Code Sec. 274d, 28 U.S.C. A. § 400; Stephenson v. Equitable Life Assurance Soc., 4 Cir., 1937, 92 F.2d 406, loc. cit. 410; National Hairdressers' & Cosmetologists' Ass'n v. Philad. Co., D.C. D.Del., 1941, 41 F.Supp. 701, affirmed in 3 Cir., 1942, 129 F.2d 1020; Interstate Natural Gas Co. v. Louisiana Public Service Commission, D.C.E.D.La., 1940, 34 F. Supp. 980.